# EXHIBIT 1



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed: COMPLAINT**
**May 1, 2024 14:39**

By: ELLIOTT MARQUIS YOUNG 0074275

Confirmation Nbr. 3155863

CASTRO LAW, LLC                                        CV 24 996863

     vs.

JGW DEBT SETTLEMENT, LLC                **Judge:**  RICHARD A. BELL

**Pages Filed:**  46

**IN THE COURT OF COMMON PLEAS**
**CUYAHOGA COUNTY**
**GENERAL DIVISION**

| | | |
|---|---|---|
| CASTRO LAW, LLC, | ) | CASE NO. |
| 2371 Huff Place | ) | |
| Highland, MI 48356 | ) | JUDGE |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JGW DEBT SETTLEMENT, LLC | ) | COMPLAINT FOR INJUNCTIVE |
| 1200 Morris Drive | ) | RELIEF |
| Chesterbrook, PA 19087 | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF**

Plaintiff, Castro Law, LLC ("Castro") states as follows for its complaint against Defendant, The JGW Debt Settlement, LLC ("JGW"):

**INTRODUCTION**

1.      Castro and JGW are parties to a written agreement, pursuant to which JGW provided certain outsourced customer service and administrative support services to Castro, a law firm, and Castro's clients. A true and accurate copy of the Agreement between Castro and JGW (the "Agreement") is attached hereto as **Exhibit 1**.

2.      In March 2024, JGW suddenly announced via a letter that "without delay" it was "terminating" the Agreement and "severing ties completely" with

Castro. JGW's purported "termination" is baseless, and it constitutes a repudiation of Agreement.

3. The Agreement contains a mandatory mediation and arbitration provision. Accordingly, Castro has, concurrent with the filing of this Complaint, submitted a demand for mediation to JGW, as required under the Agreement.

4. However, the Agreement expressly permits the parties to seek injunctive relief from a court for certain breaches of the Agreement (such as those alleged here), notwithstanding the obligation to otherwise mediate and/or arbitrate the underlying disputes.

5. Despite repeated demands by Castro, JGW has refused to return all of Castro's client data as required by the Agreement. That information unquestionably belongs to Castro, not JGW, and Castro requires immediate access to that information to effectively provide legal services to its clients.

6. Castro and its clients will suffer irreparable harm if Castro must wait for the conclusion of mediation (and, if unsuccessful, the appointment of an arbitrator and conclusion of an arbitration proceeding before the AAA) before it may seek the injunctive relief requested herein.

7. Time is of the essence regarding this dispute and judicial intervention is required.

8. Thus, Castro turns to this Court for narrow purpose of securing injunctive relief for the return of its client information during the pendency of

mandatory mediation and arbitration proceedings pursuant to Section 3 of the Federal Arbitration Act. 9 U.S.C. § 3.

## FACTUAL BACKGROUND

### The Parties, Jurisdiction, and Venue

9.     Castro is a consumer advocacy law firm that represents clients in various states (including Ohio) who are looking for ways to reduce their debt burden. Castro works with its clients and their creditors in an effort to restructure or compromise debts, and it defends clients in litigation.

10.     Castro operates on a contingency fee model. Under that model, Castro's clients pay Castro a set percentage (generally 27%) of the amount of each of the debts for which the client retains Castro (the "Performance Fee"). However, Castro receives the Performance Fee payments from its clients only after it has settled a particular debt.

11.     Castro is an Oklahoma limited liability company with its principal place of business in Highland, Michigan. Castro has members in at least the following states: Connecticut, Georgia, Hawaii, Illinois, Kansas, Maine, New Hampshire, New Jersey, Ohio, Rhode Island, South Carolina, and Vermont.

12.     JGW provides certain non-legal and administrative support functions to Castro to facilitate Castro's representation of clients, such as addressing non-legal customer service issues, answering clients' non-legal questions, handling client requests to change payment schedules, gathering documents from clients, client file

maintenance, scanning documents, and other similar administrative tasks (the "Support Services").

13.     JGW is a Delaware limited liability company with its principal place of business located in Chesterbrook, Pennsylvania whose sole member is J.G. Wentworth Company, LLC, which is a Delaware limited liability company.

14.     Section 8 of the Agreement provides that:

Each Party hereby agrees to submit to the jurisdiction of any state or federal court sitting in Cleveland, Ohio in any action or proceeding arising out of or relating to the enforcement of the arbitration provisions of this Agreement. Each Party hereby agrees to waive any defense of inconvenient forum to the maintenance of any action or proceeding so brought in Cleveland, Ohio.

(Ex. 1 ¶8(f)). Accordingly, jurisdiction and venue are proper in this Court.

15.     Under the Agreement, the Federal Arbitration Act (9 U.S.C. § 1, et seq.) and the substantive laws of the State of Delaware apply to this action. (Ex. 1 § 8(e)).

## Castro And JGW Enter Into The Agreement

16.     On or about February 21, 2022, Castro and JGW entered into the Agreement that is attached as <u>Exhibit 1</u>. The Agreement contains several provisions that are relevant to this action.

17.     JGW agreed to provide Castro and Castro's Applicable Clients with the Support Services. (Ex. 1 at § 1(c)).

18.     Under the Agreement, "Applicable Clients" are defined as:

[T]hose clients of [Castro] at any particular time who (i) were introduced to [Castro] by [JGW] or otherwise pre-screened by [JGW], (ii) have executed a retainer agreement with [Castro] for consumer debt negotiation legal

representation, and (iii) are clients in good standing of [Castro] at such time of determination pursuant to the terms of such retainer agreement.

(Ex. 1 at § 1(b)).

19. In exchange for the Support Services, Castro agreed to pay JGW fees in an amount equivalent to 70% of the Performance Fees upon resolution of debts for Applicable Clients. (Ex. 1 at § 2(c)).

20. Because JGW also provides similar services to other law firms, the Agreement required that JGW provide Castro with at least 75% of the total enrolled debts serviced by JGW. (Ex. 1 §1(i)).

21. The Agreement has a three-year term (*i.e.*, through February 20, 2025) and provides that it may be terminated only by: (a) non-renewal; or (b) for cause. (Ex. 1 at §§ 3(a)-(c)).

22. With respect to Castro, "cause" for termination is defined as:

(A) material breach of this Agreement by [Castro], which, if capable of being cured, is not cured within thirty (30) days written notice thereof; (B) [Castro] becomes the subject of a voluntary or involuntary petition in bankruptcy or any proceedings relating to insolvency, receivership or liquidation, admits in writing its inability to pay debts generally as they come due, makes an assignment for the benefit of creditors, or ceases to do business as a going concern; (C) [Castro] is prohibited or materially impaired by law, regulation, or disciplinary action from offering or providing debt negotiation legal services as to the Applicable Clients; or (D) [Castro] ceases to be licensed to perform the duties of [Castro] under this Agreement.

(Ex. 1 at § 3(c)(i)).

23. Upon a termination for cause by JGW, JGW had the option to continue to provide the Support Services to Applicable Clients, provided that such Support Services continued to be supervised by a Castro attorney. (Ex. 1 at § 3(c)(ii)).

24.    The Agreement also provides substantial protections for "Confidential Information." Under the Agreement, "Confidential Information" is broadly defined as "all non-public information of [JGW, Castro] or Applicable Clients (whether written, oral or in another medium) provided by a Party or an Applicable Client, or of which a Party comes into possession, and all notes, analyses or other material prepared by a Party containing or based, in whole or in part, on any such Confidential Information." (Ex. 1 § 5(a)(i)).

25.    Under the Agreement, JGW could use Confidential Information of Castro and the Appliable Clients *solely* for the "Purpose" of the Agreement, which is defined as "the facilitation of [JGW]'s continuing provision of [Support] Services under [the] Agreement[.]" (Ex. 1 at §§ 5(a)(ii), 5(c)(i)).

26.    The Agreement further provides that, upon written demand, all Confidential Information shall be returned, and all copies destroyed, within ten days of such demand. (Ex. 1 § 5(g)).

27.    The parties specifically agreed that the protections for Confidential Information were critically important:

> ***Notwithstanding Section 8(j) [Mediation and Arbitration] hereof***, each of [Castro] and [JGW] acknowledges that (i) the protections set forth in this Section 5 are of vital concern to the Parties, (ii) any violation hereof would cause irreparable harm to the other Party, (iii) monetary damages for any violation hereof would not be adequate compensation, (iv) the restrictions set forth herein will not prevent either [Castro] or [JGW] from conducting business, and (v) the covenants set forth herein are a vital part of the negotiations between the Parties and that no Party would have entered into this Agreement without agreement thereto. Accordingly, each of [Castro] and [JGW] agrees that the restrictions set forth in this Section 5 are reasonable in terms of duration and scope and that, in addition to any other remedy,

> *such restrictions may be enforced by injunction proceedings (without the necessity of posting bond) to preserve the status quo, restrain a violation thereof and to compel specific performance with respect thereto, whether or not this Agreement has terminated.*

(Ex. 1 at § 5(i) (emphasis added.)

28.    Section 8(f) of the Agreement provides that, subject to the provisions of Section 5(i), the underlying disputes between the parties are subject to non-binding professional mediation in the first instance, and, if unsuccessful, to binding arbitration. (Ex. 1 at § 8(f)).

## JGW Repudiates The Agreement

29.    The parties operated under the Agreement for over two years.

30.    On March 13, 2024, JGW sent a letter to Castro by which it informed Castro that it was "terminating the…Agreement <u>for cause</u> based on violations of the no advanced fee provisions of the Telemarketing Sales Rule at 16 CFR 310 *et seq.* (the "TSR") and on a receivership of associated law firms."  A true and accurate copy of JGW's March 13, 2024 Letter is attached hereto as **Exhibit 2** (emphasis in original).

31.    The bases for termination set forth in the March 13 JGW Letter have no basis in fact.

32.    ***First,*** as JGW knows, Castro does not take advance fees from its clients. Rather, Castro's fee model is – and has always been – on a contingent basis.

33.    ***Second,*** Castro is not subject to any receivership or asset freeze.

34.     **Third,** Castro has not been "materially impaired by law, regulation, or disciplinary action from, offering or providing debt negotiation legal services." Indeed, there has been no such finding by any court, regulatory body, or disciplinary authority.

35.     **Fourth,** the "associated law firm" referenced in the March 13 JGW Letter, Phoenix, is not a defendant in any such case, is not subject to a receiver or asset freeze, and has not received any adverse findings from a court, regulatory body, or disciplinary authority that "materially impairs" its ability practice law. What's more, Phoenix has no relationship with JGW.

36.     Nonetheless, JGW informed Castro that it was "severing ties completely" and that "JGW [would] not delay its termination of the Agreement[.]" (Ex. 2 at p. 2.)

37.     JGW committed to "abide by the...Agreement's provision on Confidential Information found in Section 5" of the Agreement. (Ex. 2 at p. 2.)

38.     JGW also committed to "work cooperatively with [Castro] to transition the servicing of [Castro's] clients to another service provider if [Castro was] not planning on directly servicing [its] clients." (Ex. 2 at p. 2.)

39.     JGW also committed to "provide back-up files to the extent that [Castro had] not previously downloaded [JGW's] activity." (Ex. 2 at pp. 2-3.)

40.     On March 18, 2024, Castro responded and pointed out the factual inaccuracies of JGW's position. A true and accurate copy of the March 18, 2024 Castro Letter is attached hereto as **Exhibit 3**.

Electronically Filed 05/01/2024 14:39 / / CV 24 996863 / Confirmation Nbr. 3155863 / CLDLJ

41.     Specifically, Castro advised JGW that Castro "has never been named as a defendant in any action involving asset freezes, appointment of a receiver, or allegations about collecting advance fees."  (Ex. 3 at p. 1.)

42.     Castro also informed JGW that the purported "associated law firm," Phoenix, was not named as a defendant in any such action. (Ex. 3 at p. 1.)

43.     Castro also reminded JGW that Castro only collected fees on a contingent basis. (Ex. 3 at p. 1.)

44.     Despite that communication, JGW did not retreat. Rather, it doubled down on its position and informed Castro that it was terminating the Agreement "for cause, with immediate effect" and noted that "JGW will not recede from that position."  A true and accurate copy of the March 21, 2024 JGW Letter is attached hereto as **Exhibit 4**.

45.     JGW demanded that Castro provide it with the identity of its chosen successor servicer by the close of business on March 26, 2024, and that it would cease all servicing by April 1, 2024. (Ex. 4 at p. 1.)

46.     JGW reiterated its commitment to "cooperation in a transition to an alternative servicer," but noted that any "discussion would be limited to transition, not reconsideration." (Ex. 4 at pp. 1-2.)

### Castro Retains A New Servicer, JGW Changes Its Mind

47.     Faced with this unequivocal repudiation and refusal to retract, Castro was forced to move quickly and transition its clients from JGW to a new servicer.

Electronically Filed 05/01/2024 14:39 / / CV 24 996863 / Confirmation Nbr. 3155863 / CLDLJ

48. To that end, Castro engaged National Fidelity Financial ("NF Financial") to provide the Support Services to its clients.

49. On March 25, 2024, Castro informed JGW that it would transition the Support Services to NF Financial and that it would be prepared to do so by JGW's previously demanded date of April 1, 2024.

50. JGW initially cooperated with the transition of the Support Services to NFF.

51. However, on April 1, 2024, JGW, through counsel, informed Castro that it had "re-evaluated the transfer" and determined that it wanted to "continue to service the existing Castro clients through the conclusion of their programs." A true and accurate copy of April 1, 2024 communication from JGW is attached hereto as **Exhibit 5**.

52. JGW then refused to provide Castro and NF Financial with access to Castro's own data, including information provided by and pertaining to Applicable Clients.

53. JGW also continued to communicate with Applicable Clients, despite Castro's express direction to cease all such communications and servicing, and instead transition those functions to NF Financial.

54. Accordingly, on April 19, 2024, Castro demanded that JGW cease and desist from communication with its clients, and Castro demanded the immediate return of Castro's Confidential Information pursuant to Section 5 of the Agreement:

> Pursuant to Section 5 of the...Agreement, and your previous assurances that JGW would 'work cooperatively' to transition Castro's

clients, Castro requests the immediate return of all Confidential Information. Castro further requests that JGW cooperate with Castro and CFT to provide NF Financial immediate access to Castro's client data.

A true and accurate copy of the April 19, 2024 Castro Letter is attached hereto as **Exhibit 6**.

55.     Instead of complying with its contractual obligations and promptly returning the Confidential Information, JGW instead responded with another letter on April 23, 2024, in which it stated that it would hold the Confidential Information hostage until it was paid nearly half a million dollars for undefined and unsubstantiated "fees."  A true and accurate copy of the April 23, 2024 JGW Letter is attached hereto as **Exhibit 7**.

56.     As of April 29, 2024, JGW has not returned Castro's Confidential Information.

57.     Without the Confidential Information, Castro cannot effectively transition the Support Services for its clients to NF Financial, which severely hampers and irreparably harms Castro's ability to effectively and efficiently serve its clients by settling their debts.

**Count I – Repudiation Of The Agreement**
**JGW Is Liable to Castro for Repudiation Of The Agreement**

58.     Castro restates and realleges Paragraphs 1-57 as though fully restated and realleged as this Paragraph 58.

59. Breach of contract/Repudiation of the Agreement is one of the grounds for Castro's request for injunctive relief pending mediation and/or arbitration that is set forth in Count III.

60. The Agreement is a valid and enforceable contract.

61. JGW's March 13, 2024 Letter, March 21, 2024 Letter, and failure to retract the same individually and collectively constitute an unequivocal repudiation of the Agreement.

62. A repudiation of a contract, coupled with non-performance, gives rise to a total and material breach of the Agreement. *See* Ex. 1 §3(C)(i)(x).

63. Accordingly, JGW is in total and material breach of the Agreement.

64. Castro was harmed by JGW's repudiation of the Agreement and subsequent non-performance.

65. Namely, Castro has been harmed in three principal ways: (a) by JGW failing to provide the Support Services to the Applicable Clients, resulting in disruption to Castro's operations and harm to its clients; (b) by JGW failing to provide Castro with client enrollments at a level of 75% or more of JGW's total enrolled debt across all programs; and (c) by incurring the costs and expenses associated with identifying and retaining a new servicer, and transitioning Applicable Clients to a new servicer.

## Count II - Breach Of Contract

66. Castro restates and realleges Paragraphs 1-65 as though fully restated and realleged as this Paragraph 66.

67.     Breach of contract is another basis for Castro's request for injunctive relief pending mediation and/or arbitration that is set forth in Count III.

68.     JGW has breached the Agreement, including but not limited to, the following respects:

a. By using Confidential Information for purposes other than to facilitate JGW's continued provision of the Support Services, in violation of § 5(c)(i) of the Agreement;

b. By failing to return all Confidential Information within ten days following Castro's demand for same, in violation of § 3(g) of the Agreement.

c. By terminating the Agreement purportedly "for cause" without an appropriate basis to do so, in violation of § 3(c) of the Agreement.

69.     As a result of JGW's breaches, Castro has been damaged.

**Count III – Castro's Request for Immediate Injunctive Relief**

70.     Castro incorporates allegation 1-69 of the Complaint as if fully restated herein as this Paragraph 70.

71.     Ohio procedural and substantive law authorizes this courts to grant preliminary injunctive relief to prevent irreparable harm and to preserve the ability to render a meaningful decision on the merits.

72.     Absent judicial intervention and the entry of an immediate Order by this Court, JGW will continue to violate the Agreement, improperly and wrongfully withhold information and client records that unequivocally belong to Castro,

thereby further causing irreparable harm for which a monetary judgment cannot fully resolve.

73.     The Agreement is governed by the Federal Arbitration Act (9 U.S.C. § 1, et seq.) and the substantive laws of the State of Delaware. Ex. 1 §8(e).

74.     Castro is likely to succeed on the merits regarding its claim for breach of contract/repudiation of the Agreement, as the March 13 JGW Letter constitutes an unequivocal repudiation of the contract with no basis in fact.

75.     In addition, Castro is likely to succeed on the merits regarding its claim for breach of contract, as JGW has wrongfully withheld Castro's Confidential Information for an improper purpose, despite demands for return of same.

76.     Castro has been, and will continue to be, irreparably harmed if JGW is not ordered to return the Confidential Information, as Castro requires access to such information to represent its clients effectively and efficiently, and to transition the Support Services to NF Financial.

77.     The issuance of a Temporary Restraining Order and preliminary injunction will prevent further irreparable harm to Castro and Castro's Applicable Clients, and will not cause undue inconvenience or loss to the JGW or the public.  In fact, a preliminary injunction will affirmatively protect both the interests of Castro and Castro's Applicable Clients who rely upon the Support Services.

WHEREFORE, Plaintiff Castro Law, LLC respectfully requests that this Court:

(1)     Enter temporary, preliminary, and permanent injunctive relief requiring Defendant JGW Debt Settlement, LLC to immediately return all Confidential Information to Plaintiff Castro Law, LLC, including without limitation all information relating to or provided by Castro's Applicable Clients, and to immediately provide Plaintiff Casto Law, LLC and its vendor, NF Financial, with access to all Castro's Applicable Client information;

(2)     Enforce the terms and conditions of the temporary restraining order and the grant of preliminary injunctive relief throughout the pendency of the mediation and arbitration proceedings required under the Agreement;

(3)     Award Plaintiff its reasonable attorneys' fees, costs, and expenses associated with bringing this action;

(4)     Award Plaintiff such other relief as this Court deems just and necessary; and

(5)     In the event that the claims in Counts I and II are not resolved via mediation and/or arbitration, and this Court must decide those claims on the merits, find in favor of Castro and against JGW on those claims and award Castro all monetary and other relief to which it is entitled.

15

Dated: May 1, 2024

Respectfully submitted,

_/s/ E. Mark Young_
E. Mark Young (0074275)
Roetzel & Andress, LPA
1375 E. 9th Street
One Cleveland Center, 10th Floor
Cleveland, Ohio 44114
Phone:      (216) 623-0150
Facsimile: (216) 623-0134
Email: emyoung@ralaw.com

And

John J. Rutter (0079186)
Roetzel & Andress, LPA
222 S. Main Street
Akron, OH  44308
Ph:  (330) 849-6713
Fax:  (330) 376-4577
Email: jrutter@ralaw.com

And

Emily Shupe (PHV No. 15009-2023)
Rathje Woodward LLC
300 East Roosevelt Road
Suite 300
Wheaton, Illinois 60187
Ph:  (630) 510-4930
Email:  eshupe@rathjelaw.com

*Attorneys for Plaintiff,*
*Castro Law, LLC*

16

## SERVICE AGREEMENT

This Service Agreement (this "Agreement") is made and entered into as of February 21, 2022, by and between Castro Law, LLC ("LAW FIRM"), JGW Debt Settlement, LLC ("SERVICER"). Each of LAW FIRM and SERVICER shall sometimes be referred to herein as a "Party" and collectively as the "Parties" to this Agreement.

WHEREAS, LAW FIRM desires to retain SERVICER to provide prospective client screening, administrative and non-legal law related services for the benefit of LAW FIRM and its clients for its consumer debt negotiation legal representation business, as more particularly described in this Agreement, and subject in all cases to the terms and conditions set forth herein;

WHEREAS, LAW FIRM desires to retain supervision over SERVICER's provision of services under this Agreement in a manner sufficient to enable LAW FIRM's compliance with its regulatory obligations and obligations to its clients; and

WHEREAS, the Parties intend that this Agreement is and shall be deemed for all purposes to be a non-exclusive reciprocal referral agreement under applicable laws, rules and regulations.

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties intending to be legally bound agree as follows:

1.  Engagement of SERVICER.

(a)  General.  LAW FIRM hereby engages SERVICER to provide the Services (as defined below), for the benefit of LAW FIRM in the conduct of its representation of clients seeking consumer debt negotiation legal services pursuant to the terms of this Agreement.  SERVICER hereby accepts such engagement and agrees to provide such Services in accordance herewith.

(b)  Applicable Clients.  For purposes hereof, the term "Applicable Clients" shall mean those clients of LAW FIRM at any particular time who (i) were introduced to LAW FIRM by SERVICER or otherwise pre-screened by SERVICER, (ii) have executed a retainer agreement with LAW FIRM for consumer debt negotiation legal representation, and (iii) are clients in good standing of LAW FIRM at such time of determination pursuant to the terms of such retainer agreement.

(c)  Services.  For purposes hereof, the "Services" to be provided by SERVICER under LAW FIRM's direct supervision under this Agreement shall consist of the following:

(i)  The provision and management of certain promotional and marketing services for the purpose of increasing LAW FIRM Applicable Client base and the goodwill and public image of LAW FIRM brand for consumer debt negotiation legal services;

(ii)  The development, management and prospective screening of qualified leads to generate potential Applicable Clients for LAW FIRM;

**EXHIBIT 1**

(iii)     The provision of administrative non-legal services as primary support staff of LAW FIRM in connection with LAW FIRM's consumer debt negotiation legal services business, including, but not limited to, facilitating execution by prospective Applicable Clients of the LAW FIRM's retainer agreement and associated enrollment documents, Applicable Client enrollment, compliance with prospective client qualification criteria, client support, client fee accounting, assistance with financial workout analysis, general administrative support and payment processor support, and assistance regarding the establishment and maintenance of efficient processes and criteria in the engagement of creditors and collectors in an effort to modify and settle Applicable Clients' enrolled debts;

(iv)     The provision of human resources administrative and support functions for LAW FIRM's management of its co-located employees, including recruiting, payroll and benefits administration, onboarding and offboarding; and

(v)     Working directly with LAW FIRM on periodic or remedial training, performance reviews and audits (both onsite and offsite), as may be requested by LAW FIRM from time to time, and satisfactorily resolving any compliance, operational or procedural deficiencies or other issues identified in such training, reviews and audits within the scope of this Agreement.

(d)     <u>Performance of Services</u>.  SERVICER shall comply with all federal, state and local laws, rules, regulations, orders and ethical requirements (collectively, "Legal Requirements") in the performance of the Services hereunder.  SERVICER shall provide and cause the Services to be provided in a professional and timely manner, including, but not limited to responding to all inquiries and handling all complaints by Applicable Clients in a timely fashion.

(e)     <u>LAW FIRM Actions</u>.  LAW FIRM shall provide consumer debt negotiation legal representation to Applicable Clients.  LAW FIRM and its attorneys shall at all times during the effectiveness of this Agreement be duly licensed and in good standing in the jurisdictions in which they are representing Applicable Clients  LAW FIRM shall have at least one attorney licensed in each state in which it represents Applicable Clients.  LAW FIRM will approve all Applicable Client retainer agreements prior to acceptance and before any fee is charged.  The Applicable Client retainer agreements will set forth the performance fee described in Section 2(a) and shall state that non-legal administrative services will be performed by a third-party vendor. LAW FIRM shall monitor, approve and supervise the performance by SERVICER of the Services, pursuant to guidelines and procedures provided by LAW FIRM from time to time and communicated to SERVICER in writing and/or by email correspondence; provided, however, that employees of SERVICER will in no event be deemed to be employees of LAW FIRM with respect to the provision of Services under any Legal Requirements.

(f)     <u>No Legal Advice</u>.  Notwithstanding anything to the contrary in this Agreement, LAW FIRM and SERVICER hereby acknowledge and agree that:

(i)     The monitoring, approval and supervision activities to be undertaken by LAW FIRM for the Services provided by SERVICER shall not, and in no event shall the same be deemed to, constitute the provision of legal advice by LAW FIRM or its attorneys to SERVICER;

2

(ii)     LAW FIRM and its member attorneys shall have no liability to SERVICER under or for any claim or legal theory based on the reliance of legal advice from LAW FIRM, and SERVICER shall not make or assert any such claim or legal theory against LAW FIRM or its member attorney; and

(iii)     SERVICER is not responsible for conducting legal analysis or providing legal advice to Applicable Clients pursuant to the retainer agreement between LAW FIRM and Applicable Clients, and is in fact prohibited from providing legal advice and performing legal services.

(g)     <u>Intellectual Property Rights</u>.  During the term of this Agreement, LAW FIRM hereby grants to SERVICER a limited, non-exclusive, royalty-free license within the United States of America, to use, reproduce, reformat, publicly display, and distribute the trademarks, trade dress and other content with respect to the name Lori A. Leigh Law Partners, PLLC and any trade name, fictitious name or "doing business as" name of LAW FIRM for the purposes of performing the Services, subject, in all cases, to the prior and continuing monitoring, auditing and approval by LAW FIRM in its reasonable discretion of each instance of use by SERVICER thereof.  LAW FIRM will use its reasonable efforts to timely respond to all requests for such approval and outline the basis for all rejections.  The license of intellectual property provided to SERVICER hereunder shall automatically terminate immediately upon the termination of this Agreement pursuant to its terms, and SERVICER shall have no further rights therein or thereto.

(h)     <u>Restricted Jurisdictions and Continuing Service Obligation</u>.  In the event that LAW FIRM determines in its good faith reasonable discretion that LAW FIRM shall no longer charge or receive fees from Applicable Clients in any particular jurisdiction on a prospective basis, then SERVICER hereby agrees that, upon the request of LAW FIRM, it shall continue to provide Services under this Agreement to all Applicable Clients within such jurisdiction as of the date of such determination by LAW FIRM without charge for the duration of LAW FIRM'S representation of such Applicable Clients, provided that LAW FIRM is also providing its legal services without any compensation.  LAW FIRM further agrees that should these circumstances arise, LAW FIRM will cease accepting any new clients in such jurisdiction until it is established that fees can be collected and both SERVICER and LAW FIRM can be paid by such new Applicable Clients.

(i)     SERVICER agrees that during the Term it shall provide to LAW FIRM client enrollments constituting at least seventy-five percent (75%) of the total enrolled client debt attributable to debt settlement clients enrolled by all law firms with which SERVICER has an agreement for the provision of non-legal services similar to the Services to be provided to LAW FIRM under this Agreement, and a failure by SERVICER to do so shall constitute a material breach of this Agreement, subject to the notice and cure provisions of Section 3(c).  SERVICER will provide, within ten (10) business days following each June 30th and December 31st occurring during the Term, a signed certification in writing stating that SERVICER is in compliance with the requirement set forth in this section.  LAW FIRM will have the right to request an annual certification from SERVICER's auditor stating that SERVICER is in compliance with the requirement set forth in this section which will be delivered no more than thirty (30) days after such written request is received by SERVICER.  Solely for purposes of the first sentence of this Section 1(i), the Parties agree that a "client enrollment" shall mean an individual or co-applicants

enrolling jointly who has/have executed a retainer agreement with the law firm and has made a first payment into their payment processor dedicated account.

2.  Fees.

(a)  LAW FIRM Performance Fee. As compensation for its services, LAW FIRM will charge its Applicable Clients a performance fee upon the settlement of each scheduled debt of the Applicable Client equal to 27% of the enrolled amount of the particular scheduled debt so settled.

(b)  SERVICER Fee. As compensation for the provision of the Services by SERVICER hereunder, LAW FIRM will pay SERVICER a fee (the "Fee") upon the settlement of a particular scheduled debt of a particular Applicable Client equal to 70% of the amount of the performance fee charged by LAW FIRM to its Applicable Clients (i.e. 18.9% of the enrolled amount of the particular scheduled debt so settled based upon a 27% performance fee charged by LAW FIRM).

(c)  Partial Fees. Notwithstanding the foregoing, in the event that LAW FIRM is paid less than 27% of the enrolled amount of a particular scheduled debt as its performance fee by an Applicable Client then SERVICER shall only be entitled to payment from LAW FIRM of a proportionate amount of the Fee.

(d)  Payment Terms. LAW FIRM will authorize its payment processor to pay SERVICER that portion of its Fee allocable to any particular Applicable Client not later than two (2) business days following receipt by LAW FIRM of the related fee from such Applicable Client. Such payment will be made by ACH or wire transfer of immediately available funds, or as otherwise mutually agreed.

(e)  Refund by Law Firm of Fees to Law Firm Client. LAW FIRM shall have the right, in its discretion, to pay to any Applicable Client a partial or full refund or credit of fees and costs the Applicable Client paid to LAW FIRM; provided that LAW FIRM first will consult with SERVICER as to the nature of the Applicable Client's situation or complaint. In the event LAW FIRM provides such a full or partial refund or credit to an Applicable Client, SERVICER shall bear a proportionate share thereof, and SERVICER shall pay such amount to LAW FIRM within ten (10) days following demand therefor if such amount has already been paid to SERVICER, or, at LAW FIRM's option, LAW FIRM may deduct such amount from any sums due to SERVICER hereunder.

(f)  Tax Duties and Responsibilities. SERVICER will be responsible for the payment of all federal, state and local taxes and payments arising out of SERVICER's activities under this Agreement, and its receipt of Fees pursuant to this Section 2.

(g)  Processors. LAW FIRM will use one (1) or more payment processors to expedite the collection of LAW FIRM's fees from its clients and payment of the Fee to SERVICER. The payment processor must be an independent third party not affiliated with either LAW FIRM or SERVICER. LAW FIRM will consult with SERVICER before any change in payment processors and will decide upon payment processors based upon LAW FIRM's determination of the best interests of its Applicable Clients.

4

3.     Term and Termination.

(a)     Term of Agreement.  The initial term of this Agreement shall begin on the Effective Date and end at the close of business on the third anniversary thereof (the "Initial Term"). Following the Initial Term, this Agreement shall continue to be effective for successive one (1) year terms (each, a "Renewal Term"), unless either Party shall provide written notice to the other Party of its termination of this Agreement no greater than one-hundred and eighty (180) days and no less than ninety (90) days prior to the end of the Initial Term or any Renewal Term, as applicable.  The Initial Term combined with any subsequent Renewal Terms shall be referred to hereinafter as the "Term" and the final day of the Term shall be referred to hereinafter as the "Termination Date."

(b)     Non-Renewal of Term.  The expiration of this Agreement following the Initial Term or any Renewal Term shall be on a prospective basis only, pursuant to which following the Termination Date no new prospective clients shall be identified by SERVICER to LAW FIRM and no additional Applicable Clients shall be signed by LAW FIRM; provided, however, that SERVICER shall continue to provide the Services to LAW FIRM in exchange for the applicable Fee until such time as no further Applicable Clients remain, and such Services are capable of being supervised by an appropriately licensed attorney, all in accordance with the provisions of this Agreement, which provisions shall survive such expiration of the then-current Term.

(c)     Termination With Cause.  Each Party shall have the right to end this Agreement for Cause during the Term upon written notice to the other Party.

(i)     "Cause" by LAW FIRM is defined as any of the following:  (A) material breach of this Agreement by LAW FIRM which, if capable of being cured, is not cured within thirty (30) days of written notice thereof; (B) LAW FIRM becomes the subject of a voluntary or involuntary petition in bankruptcy or any proceedings relating to insolvency, receivership or liquidation, admits in writing its inability to pay debts generally as they come due, makes an assignment for the benefit of creditors, or ceases to do business as a going concern; (C) LAW FIRM is prohibited or materially impaired by law, regulation or disciplinary action from offering or providing debt negotiation legal services to the Applicable Clients; or (D) LAW FIRM ceases to be licensed to perform the duties of LAW FIRM under this Agreement.  "Cause" by SERVICER is defined as any of the following: (X) material breach of this Agreement by SERVICER which, if capable of being cured, is not cured within thirty (30) days of written notice thereof; (Y) SERVICER becomes the subject of a voluntary or involuntary petition in bankruptcy or any proceedings relating to insolvency, receivership or liquidation, admits in writing its inability to pay debts generally as they come due, makes an assignment for the benefit of creditors, or ceases to do business as a going concern; (Z) SERVICER is prohibited or materially impaired by law or regulation from offering or providing the Services to LAW FIRM and the Applicable Clients.

(ii)     Following a termination for Cause initiated by SERVICER, SERVICER shall have the option to continue to provide Services to all then-existing Applicable Clients in accordance with this Agreement in exchange for the applicable Fee for so long as SERVICER continues to provide Services in accordance with this Agreement, and such

Services continue to be supervised by an appropriately licensed attorney of LAW FIRM. In such event the provisions of this Agreement shall survive a termination by SERVICER for Cause with respect to the continuing provision of Services to the then-existing Applicable Clients. Notwithstanding the foregoing, in the event of a non-appealable judgment from a court of competent jurisdiction, or a written opinion from a neutral law firm that is experienced in the attorney-model debt negotiation field selected jointly by the Parties and acting in good faith, it is determined that continuing the affiliation between LAW FIRM and SERVICER would cause irreparable harm, SERVICER has the option to cease providing Services, and SERVICER shall have no further obligations under this Agreement other than as set forth in Section 8(l), and no further right to any Fee pursuant to this Agreement.

(iii)    Following a termination for Cause initiated by LAW FIRM, SERVICER shall work in good faith with LAW FIRM to transition the provision of SERVICES on behalf of and for the benefit of Applicable Clients to LAW FIRM or another entity at the direction of LAW FIRM, and SERVICER shall have no further right to any Fee pursuant to this Agreement other than any Fees earned but not paid prior to such termination.

(d)    <u>Termination Due to Legal Requirement</u>. Each of LAW FIRM and SERVICER shall have the right to terminate operations (i) with respect to Applicable Clients and potential clients in any particular state, but only with respect to such state, immediately upon delivery of written notice to the other Party in the event that a non-appealable judgment from a court of competent jurisdiction determines LAW FIRM or SERVICER to be in violation of any law, rule, regulation or order of such state related to the provision of debt negotiation services, and such Party is unable to revise its business practices to comply with such state law, rule, regulation or order, or (ii) with respect to potential clients in any particular state upon ninety (90) days written notice; provided, however, that SERVICER shall continue to provide the Services to LAW FIRM with respect to any Applicable Clients in exchange for the applicable Fee until such time as no further Applicable Clients remain in such state, provided that such Services are capable of being supervised by an appropriately licensed attorney of LAW FIRM, all in accordance with the provisions of this Agreement.

4.    <u>Restrictions and Covenants</u>.

(a)    <u>SERVICER</u>.  Prior to the Termination Date and for a period of one (1) year thereafter (the "Restricted Period"), SERVICER shall not, directly or indirectly, recruit or solicit for the purpose of hiring or engaging as an independent contractor, or hire, employ or engage as an independent contractor, any person or entity employed or engaged as an independent contractor by LAW FIRM, or any person or entity who or which was an equity-owner of LAW FIRM, in each case within one (1) year prior to the date of such solicitation, employment or engagement. Notwithstanding the foregoing, the restrictions set forth in this Section 4(a) shall not apply to the hiring, employing or engaging of any payment processing company, any outside attorney jointly representing both SERVICER and LAW FIRM in connection with any matter, or any person who works in SERVICER's principal office other than any co-located supervising attorney of LAW FIRM. SERVICER agrees and acknowledges that in the event of any violation of any obligation set forth in this Section 4(a), the time period applicable to such obligation shall be extended by a

period of time equal from the date the activity constituting such violation began through the date the activity or activities constituting such violation terminated.

(b)     <u>LAW FIRM.</u> During the Restricted Period, LAW FIRM hereby agrees that it shall not, directly or indirectly, recruit or solicit for the purpose of hiring or engaging as an independent contractor, or hire, employ or engage as an independent contractor, any person or entity employed or engaged as an independent contractor by SERVICER within one (1) year prior to the date of such solicitation, employment or engagement. Notwithstanding the foregoing, the restrictions set forth in this Section 4(b) shall not apply to the hiring, employing or engaging of any payment processing company, or any outside regulatory, litigation or transactional attorney jointly representing both SERVICER and LAW FIRM in connection with any matter. LAW FIRM agrees and acknowledges that in the event of any violation of any obligation set forth in this Section 4(b), the time period applicable to such obligation shall be extended by a period of time equal from the date the activity constituting such violation began through the date the activity or activities constituting such violation terminated.

(c)     <u>Acknowledgement.</u> It is the Parties' intent that each of the terms, provisions and restrictions contained in this Section 4 be read and interpreted with every reasonable inference drawn in favor of its enforceability. However, it is also the Parties' intent that if any term, provision or restriction contained in this Section 4 is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions thereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated. Finally, it is also the Parties' intent that if a court of competent jurisdiction should determine that all or part of any term, provision or restriction contained in this Section 4 is unenforceable due to over-breadth, then such court shall modify all or part of said term, provision or restriction to the minimum extent necessary to make it enforceable under the prevailing circumstances.

(d)     <u>Enforcement by Injunction.</u> Notwithstanding Section 8(f) hereof, each of LAW FIRM and SERVICER acknowledges that (i) the protections set forth in this Section 4 are of vital concern to the Parties, that monetary damages for any violation thereof would not be adequate compensation, and that the restrictions set forth herein will not prevent any Party from conducting business, and (ii) the covenants set forth in this Section 4 are a vital part of the negotiations between the Parties, and that no Party would have entered into this Agreement without agreement thereto. Accordingly, each of LAW FIRM and SERVICER agrees that the restrictions set forth in this Section 4 are reasonable in terms of duration and scope and that, in addition to any other remedy, such restrictions may be enforced by injunction proceedings (without the necessity of posting bond) to preserve the status quo, restrain a violation thereof and to compel specific performance with respect thereto, whether or not this Agreement has terminated.

5.     <u>Confidential Information.</u>

(a)     <u>Definitions.</u> As used in this Agreement the following terms will have the following meanings:

(i)     "Confidential Information" means all non-public information of SERVICER, LAW FIRM or Applicable Clients (whether written, oral or in another medium) provided by a Party or an Applicable Client, or of which a Party comes into

7

possession, and all notes, analyses or other material prepared by a Party containing or based, in whole or in part, on any such Confidential Information, other than information which (i) can be demonstrated as being known to the receiving Party at the time of disclosure, (ii) is or becomes publicly known through no wrongful act of the receiving Party, or (iii) has been rightfully received by the receiving Party from a third party who is authorized to make such disclosure;

(ii)    "Purpose" means the facilitation of SERVICER's continuing provision of Services under this Agreement; and

(iii)    "Recipient" means each person or entity that is given access to Confidential Information by the receiving Party thereof.

(b)    Acknowledgments.  Each of LAW FIRM and SERVICER acknowledges that the other Party has invested considerable and immeasurable resources (both financial and non-financial) in developing its respective Confidential Information and that the same provides substantial value (both economic and non-economic) to such Party.

(c)    Confidentiality and Use of Confidential Information.

(i)    Each of LAW FIRM and SERVICER on behalf of themselves and their respective Recipients, affiliates, agents, representatives, members, managers, successors and assigns, agrees to utilize and disclose the Confidential Information solely for the Purpose and not for any other purpose including, without limitation, for the purpose of providing, directly or indirectly, information, advice or assistance of any nature to any person or entity competitive with the disclosing Party thereof.

(ii)    As a continuing condition to the receiving Party thereof being furnished with and having possession of Confidential Information, each of LAW FIRM and SERVICER on behalf of themselves and their respective Recipients, affiliates, agents, representatives, members, managers, successors and assigns, agrees to (A) treat all Confidential Information in strictest confidence in accordance with the terms of this Agreement, (B) employ reasonable practices, both technically and procedurally, no less protective than the manner such Party secures its own Confidential Information, to protect the Confidential Information from unauthorized physical and electronic access, and (C) utilize appropriate and sufficient safeguards to provide a level and scope of security for the Confidential Information that is not less than that which is used by the receiving Party thereof for its own confidential and proprietary data, and at no times less than what is required under applicable Legal Requirements.

(d)    Disclosure of Confidential Information to Others.  Except as provided in this Agreement, each of LAW FIRM and SERVICER on behalf of themselves and their respective Recipients, affiliates, agents, representatives, members, managers, successors and assigns, agrees that (a) disclosure of the Confidential Information will be limited to the minimum number of Recipients necessary to achieve the Purpose, and in each case only to the extent necessary for the Purpose, and (b) each Recipient will be advised of the existence and terms of this Section 5 and

that each of LAW FIRM and SERVICER is responsible for insuring that each Recipient complies fully with such terms.

(e)     Notification of Unauthorized Use or Disclosure.  Each of LAW FIRM and SERVICER on behalf of themselves and their respective Recipients, affiliates, agents, representatives, members, managers, successors and assigns, agrees to (i) immediately notify the disclosing Party of any Confidential Information in writing of any unauthorized misappropriation, disclosure or use by any person or entity of such Confidential Information, unless instructed not to disclose such circumstances by any government or administrative unit or agency, and (ii) take all steps at its own expense reasonably requested by such disclosing Party to limit, stop and remedy such misappropriation, disclosure or use, unless such disclosure is compelled by legal process or government order.

(f)     Disclosure Pursuant to Legal Process.  In the event a receiving Party of any Confidential Information or any Recipient thereof is requested or required (whether by subpoena, oral deposition, interrogatories, request for production of documents, administrative order or otherwise) to disclose any such Confidential Information, unless instructed not to disclose the request or requirement by any government or administrative unit or agency, such receiving Party and Recipient will provide the disclosing Party thereof with immediate written notice of such request or requirement, so that the disclosing Party may seek, at its expense, an appropriate protective order or waiver of compliance requiring such disclosure, or so that the disclosing Party may waive compliance with the terms of this Agreement.  In the absence of such protective order or waiver, the receiving Party or such Recipient, as applicable, may disclose only that minimum portion of the Confidential Information as is legally required to be disclosed.

(g)     Return of Confidential Information.  Each of LAW FIRM and SERVICER on behalf of themselves and their respective Recipients, affiliates, agents, representatives, members, managers, successors and assigns, agrees that no later than ten (10) business days following the written request of the disclosing Party of any Confidential Information, the receiving Party thereof and each Recipient will (i) return to the disclosing Party all Confidential Information and all copies thereof, whether in electronic or tangible form, and (ii) destroy all documents, memoranda, notes and other writings prepared by such receiving Party or any Recipient which are based on the information contained in the Confidential Information.  Following such written request, none of such receiving Party nor any Recipient will retain any copies, extracts, back-ups or other reproductions of Confidential Information, and such receiving Party and each Recipient shall permanently erase the electronic files of all Confidential Information in order to render the same completely overwritten and unrecoverable.  Notwithstanding the provisions of this Section 5 (including without limitation this Section 5(g)), following any request for the return of Confidential Information, the receiving Party and each Recipient of Confidential Information shall be permitted to retain such Confidential Information as is reasonably necessary or advisable for the continued servicing of existing clients and/or as required by applicable Legal Requirements following an Applicable Client's last activity; provided that in each case such Confidential Information shall continue to remain subject to the terms and conditions of this Agreement for so long as it remains within the Recipient's possession or control, including following the Termination Date.

9

(h)     <u>Compliance with Legal Requirements</u>. Each of LAW FIRM and SERVICER on behalf of themselves and their respective Recipients, affiliates, agents, representatives, members, managers, successors and assigns, shall maintain the confidentiality and security of Applicable Clients' personal information that is not public as required by applicable Legal Requirements relating to the privacy and security of customer information, including, but not limited to, the Gramm-Leach-Bliley Act. Each of LAW FIRM and SERVICER shall promptly notify the other Party no later than it is required to notify any Applicable Client of any compromise or breach of the privacy or security of such Applicable Client's non-public personal information.

(i)     <u>Enforcement by Injunction</u>. Notwithstanding Section 8(f) hereof, each of LAW FIRM and SERVICER acknowledges that (i) the protections set forth in this Section 5 are of vital concern to the Parties, (ii) any violation hereof would cause irreparable harm to the other Party, (iii) monetary damages for any violation hereof would not be adequate compensation, (iv) the restrictions set forth herein will not prevent either of LAW FIRM or SERVICER from conducting business, and (v) the covenants set forth herein are a vital part of the negotiations between the Parties and that no Party would have entered into this Agreement without agreement thereto. Accordingly, each of LAW FIRM and SERVICER agrees that the restrictions set forth in this Section 5 are reasonable in terms of duration and scope and that, in addition to any other remedy, such restrictions may be enforced by injunction proceedings (without the necessity of posting bond) to preserve the status quo, restrain a violation thereof and to compel specific performance with respect thereto, whether or not this Agreement has terminated.

6.     <u>Indemnification and Contribution</u>.

(a)     <u>Indemnification</u>.     Each Party shall indemnify the other Party and its members, managers, equity-holders, employees, attorneys, affiliates, and agents (collectively, "Indemnified Parties"), and save and hold each of them harmless from and against and pay on behalf of or reimburse each of the Indemnified Parties as and when incurred for any loss, liability, obligation, fine, penalty, damage, deficiency or cost of third-party investigation, and any actions, judgments, fees, costs and expenses (including, but not limited to, reasonable attorneys' and paralegals' costs and fees, and all other expenses incurred in investigating, preparing for or defending any action, demand, proceeding, investigation or claim) incident to any of the foregoing (collectively, "Damages") arising from or in connection with:

(i)     any material breach or violation of any representation, warranty, obligation or other provision of this Agreement by made by such Party, other than those with respect to a Contribution Matter, which are exclusively subject to the contribution provisions of Sections 6(c) and (d);

(ii)     any action, demand, proceeding, third-party investigation or claim by any third party (including federal and state governmental authorities, regulatory or state bar or other ethical bodies, and private actions) against or affecting any of the Indemnified Parties which, if successful, would evidence such a breach or violation described in Section 6(a)(i);

(iii)     any action, demand, proceedings, third-party investigation or claim by any third party (including, but not limited to, federal and state governmental authorities,

regulatory or state bar or other ethical bodies, and private actions) arising from such Party's conduct of its operations or business prior to the date of this Agreement; and

(iv)    any action, demand, proceedings, or claim by a sole employee of one Party claiming that the other Party is their employer or co-employer.

(b)    Indemnification Procedures.

(i)    Each of LAW FIRM and SERVICER shall give the other prompt written notice of any claim for indemnification pursuant to Section 6(a) ("Indemnification Claim"). Any failure by a Party seeking indemnification hereunder to give timely, complete or accurate notice will not affect the rights or obligations of any Party except and only to the extent that, as a result of such failure, any Indemnified Party entitled to receive such notice was deprived of its right to recover any payment under its applicable insurance coverage or was otherwise directly and materially damaged as a result of such failure to give timely notice.

(ii)    The Party required to provide indemnification under this Agreement (the "Indemnifying Party") shall have the right, upon written notice to the Indemnified Parties within ten (10) business days after receipt of the notice of an Indemnification Claim, which written notice (the "Defense Notice") shall specify the counsel to be appointed to defend such Indemnification Claim ("Defense Counsel"), to conduct at its expense the defense against such Indemnification Claim in its own name, or, if necessary, in the name of the Indemnified Party; provided, however, that the Indemnified Party shall have the right to approve the Defense Counsel in its discretion, such approval not to be unreasonably withheld or delayed. Notwithstanding the foregoing, the Indemnifying Party shall not be entitled to assume control of the defense of an Indemnification Claim and shall pay the reasonable fees and expenses of counsel retained by the Indemnified Person, if:

(A)    The Indemnification Claim seeks injunctive or other equitable relief against the Indemnified Person or involves criminal allegations;

(B)    The Indemnification Claim would operate as res judicata or collateral estoppel for other non-indemnifiable claims which would have a material adverse effect on the business, financial condition, operations or prospects of the Indemnified Party;

(C)    The Indemnification Claim imposes liability on the Indemnified Party for which the Indemnified Party is not entitled to indemnification hereunder;

(D)    The Indemnified Party, by written notice to the Indemnifying Party, states that, based on advice of counsel, applicable principles of legal ethics would prohibit a single legal counsel from representing both the Indemnified Party and the Indemnifying Party because the Indemnified Party reasonably believes that its interests in the Indemnification Claim are or can reasonably be expected to be adverse to the interests of the Indemnifying Party; or

11

(E)     The Indemnifying Party is unable to provide the Indemnified Party with reasonable assurance of its ability to pay the expenses of the defense against such Indemnification Claim.

(iii)     In the event that the Indemnifying Party shall fail to give the Defense Notice within the time period described above, it shall be deemed to have elected not to conduct the defense of the subject Indemnification Claim, and in such event the Indemnified Party shall have the right to conduct such defense in good faith and the Indemnifying Party will be liable for all costs, expenses, settlement amounts or other Damages paid or incurred in connection therewith. If the Indemnifying Party is not entitled to assume the defense of an Indemnification Claim because of reasons set forth in Section 6(b)(ii), the Indemnified Party may not settle the Indemnification Claim without the written consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed, if such settlement would lead to any material liability or create any other material obligation of the Indemnifying Party.

(iv)     If Indemnifying Party delivers a Defense Notice within the time period described above and thereby elects to conduct the defense of the subject claim, the Indemnifying Party shall diligently conduct such defense and the Indemnified Party will reasonably cooperate with and make available to the Indemnifying Party such assistance and materials as it may reasonably request, all at the expense of the Indemnifying Party, and the Indemnified Party shall have the right at its expense to participate in the defense assisted by counsel of its own choosing.  The Indemnifying Party may enter into any settlement of any Indemnification Claim; provided, however, the Indemnifying Party may not enter into any settlement of any Indemnification Claim without the prior written consent of the Indemnified Party if pursuant to or as a result of such settlement, (1) injunctive or other equitable relief would be imposed against the Indemnified Party, or (2) such settlement would or could reasonably be expected to lead to any material liability or create any other material or monetary obligation of the Indemnified Party.

(v)     Any final judgment entered or settlement agreed upon in the manner provided herein shall be binding upon the Indemnifying Party, and shall conclusively be deemed to be an obligation for which the Indemnified Party is entitled to prompt indemnification hereunder.

(vi)     If any portion of an Indemnification Claim is not paid within thirty (30) days, the Indemnified Party owed such payment shall have the right to (i) impose a one percent (1%) per month interest charge on any overdue payment balance, calculated daily, (ii) set off all amounts owing from the Indemnified Party otherwise payable to the Indemnifying Party, and (iii) receive reimbursement from the Indemnifying Party for all fees, costs and expenses (including, but not limited to, reasonable attorneys' and paralegals' fees, costs and expenses) incurred by the Indemnified Party in seeking to collect any such unpaid amount.

Electronically Filed 05/01/2024 14:39 / / CV 24 996863 / Confirmation Nbr. 3155863 / CLDLJ

(c)     Contribution.

(i)     With respect to any action brought by any federal or state government, regulatory agency, bureau, division or similar body, state bar or other ethical body, or by a private party, in each case with respect to any of the subject matter, implementation or furtherance of this Agreement, the representation of Applicable Clients by LAW FIRM, the provision of Services by SERVICER, the requirement or failure of LAW FIRM and/or SERVICER to register or qualify under any state "debt adjuster law" or similar law, rule or regulation with respect to Applicable Clients, or an alleged violation of any state consumer protection law, consumer fraud law or similar law, rule or regulation with respect to Applicable Clients (each, a "Contribution Matter"), the indemnification provisions of Sections 6(a) and (b) will not apply.  Instead, the Parties agree that each of them will be liable and responsible for all Damages arising from or in connection with any such Contribution Matter based on the LAW FIRM Proportionate Share and the SERVICER Proportionate Share, as applicable (as such terms are defined in Sections 6(c)(ii) and 6(c)(iii)).

(ii)     The "Proportionate Share" of LAW FIRM with respect to a particular Contribution Matter shall mean that percentage of the total revenue actually received by LAW FIRM with respect to the Applicable Client(s), geographic location and/or matter at issue in connection with such Contribution Matter over the dates covered by such Contribution Matter, less the Fees paid to SERVICER attributable to such Contribution Matter and less refunds in connection with such Contribution Matter actually paid by LAW FIRM; and

(iii)     The "Proportionate Share" of SERVICER with respect to a particular Contribution Matter shall mean that percentage of the total revenue actually received by LAW FIRM for a particular Contribution Matter paid to SERVICER as Fees attributable to such Contribution Matter, less refunds of any such amount actually paid by SERVICER.

(d)     Contribution Procedures.  Any payment pursuant to a claim for contribution under Section 6(c) shall be made not later than thirty (30) days after receipt by the contributing Party of written notice which states the amount of the contribution claim and includes reasonable documentation outlining the nature of the Contribution Matter and copies of relevant invoices or other documentation that reasonably evidences the request for contribution.  If any portion of such contribution payment is not paid within such thirty (30)-day period, the Party owed such payment shall have the right to (i) impose a one percent (1%) per month interest charge on any overdue payment balance, calculated daily, (ii) set off all amounts owing from the owed Party otherwise payable to the contributing Party, and (iii) receive reimbursement from the contributing Party for all fees, costs and expenses (including, but not limited to, reasonable attorneys' and paralegals' fees, costs and expenses) incurred by the owed Party in seeking to collect any such unpaid amount.

7.     Representations and Warranties.  Each of LAW FIRM and SERVICER represents and warrants to the other Party that (a) such Party has the full right, power and authority to execute, deliver and perform its obligations under this Agreement in accordance with the terms hereof; (b) this Agreement has been duly and validly executed and delivered by such Party and constitute the valid and binding obligation of such Party enforceable in accordance with its terms; and (c) the

execution, delivery and performance of this Agreement by such Party will not violate or conflict with any contract, agreement, or order to which such Party is subject.

8.    <u>General Provisions</u>.

(a)    Neutral Reading.  It is the intent of the Parties that this Agreement be deemed to have been prepared jointly by the Parties, that the language used in this Agreement be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction should be applied against either Party.

(b)    Relationship of Parties.  Nothing in this Agreement may be construed or interpreted as constituting either Party hereto as the partner, agent, principal, employee, employer or joint venturer of the other Party.  Each of LAW FIRM and SERVICER is an independent contractor.  Neither Party may assume, either directly or indirectly, any liability of or for the other Party.  Neither Party has the authority to bind or obligate the other Party and neither Party may represent that it has such authority.  The Parties do not contemplate or intend in any way a sharing of profits relating to the legal work provided by LAW FIRM to Applicable Clients.

(c)    Amendment; Waiver.  This Agreement may not be altered or modified, except by written amendment which expressly refers to this Agreement and which is duly executed by authorized representatives of both Parties.  The waiver or failure by either Party to exercise or enforce any right provided for in this Agreement shall not be deemed a waiver of any further right under this Agreement.

(d)    Interpretation.  The preamble and recitals contained in this Agreement are incorporated herein by reference and made a part hereof.  Headings are inserted herein for convenience of reference only and are to be ignored in construing this Agreement.

(e)    Governing Law.  This Agreement shall be construed in conformity with the Federal Arbitration Act (9 U.S.C. § 1, et seq.) and the substantive laws of the State of Delaware, without regard to its conflicts of laws principles.

(f)    **Mediation and Arbitration.  Subject to the provisions of Sections 4(d) and 5(i), each Party hereby agrees that in the event of any dispute arising out of or by reason of this Agreement, regardless of the facts or legal theories which may be involved, the Parties will first attempt to resolve such dispute by non-binding professional mediation under mutually agreeable procedures with the costs charged by the professional mediation service shared equally by both Parties.  In the event that such mediation is unsuccessful or does not occur within thirty (30) days following written demand therefor by a Party, the Parties shall submit such dispute to confidential binding arbitration in Cleveland, Ohio before the American Arbitration Association, pursuant to the Federal Arbitration Act (9 U.S.C. § 1, et seq.).  Each Party shall bear the fees, costs and expenses of such Party's legal counsel, witnesses and specialists.  The arbitrator's award in any such proceeding shall be final and binding, and a judgment upon such award may be enforced by any court of competent jurisdiction.  Each Party hereby agrees to submit to the jurisdiction of any state or federal court sitting in Cleveland, Ohio in any action or proceeding arising out of or relating to the enforcement of the arbitration provisions of this Agreement.  Each Party hereby agrees to waive any defense**

14

of inconvenient forum to the maintenance of any action or proceeding so brought in Cleveland, Ohio, and each Party waives any bond, surety, or other security that may be required of any other Party with respect thereto. In the event a Party fails to proceed with arbitration, unsuccessfully challenges the arbitrator's award, or fails to comply with the arbitrator's award, the other Party is entitled to costs of suit, including reasonable attorneys' and paralegals' fees and costs for having to compel arbitration or defend or enforce the award. Each Party hereby agrees that any dispute regarding the arbitrability of this Agreement, including without limitation any dispute relating to the interpretation, applicability, enforceability, conscionability or formation of this Agreement and of this arbitration requirement set forth in this Section 8(f), shall be governed by the Federal Arbitration Act and shall be resolved exclusively by the arbitrator.

(g)     Costs and Expenses. The Party prevailing in any arbitration or other proceeding under this Agreement shall be entitled to recover the reasonable costs and expenses incurred in connection therewith, including, but not limited to, reasonable attorneys' and paralegals' fees, costs and expenses.

(h)     Severability. The various terms, provisions and covenants herein contained shall be deemed to be separable and the invalidity and unenforceability of any of them shall in no manner affect or impair the validity or enforceability of the remainder thereof.

(i)     Further Assurances. Each of the Parties shall execute and deliver all such other instruments and take all such other actions as such other Party may reasonably request from time to time in order to effectuate the purposes of this Agreement.

(j)     Entire Agreement. This Agreement constitutes the entire agreement of the Parties for the transactions contemplated hereby, and there are no other prior or contemporaneous written or oral communications, agreements, undertakings, provisions, warranties, or covenants not contained or expressly incorporated herein.

(k)     Binding Agreement. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided, however, that neither Party may assign this Agreement or any of its rights, benefits or obligations hereunder without the prior written consent of the other Party in its sole and absolute discretion.

(l)     Survival. The rights and obligations contained in Sections 2(e), 2(f), 3, 4, 5, 6, 7 and 8 shall survive any termination of this Agreement.

(m)     Notices. All notices and other communications hereunder shall be sufficiently given and effective for any purpose hereunder only upon delivery by personal service or prepaid overnight delivery, in each case to the persons and addresses indicated below.

15

If to LAW FIRM:

Castro Law, LLC
Attn: Manager
2371 HUFF PLACE
HIGHLAND, MI 48356

If to SERVICER:

JGW Debt Settlement, LLC
Attn: General Counsel
201 King of Prussia Rd., Suite 210
Radnor, PA 19087

     (n)    Counterparts; Delivery.  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which, when taken together, shall be deemed to be one Agreement.  This Agreement and any amendment hereto, to the extent signed and delivered by means of a facsimile machine or by electronic mail, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

**[signature page follows]**

16

Intending to be legally bound, the Parties have caused this Agreement to be signed and effective as of the date first above written.

**Castro Law, LLC**

By: _____

Name: LoRi A. Leigh

Title:  Manager

**JGW Debt Settlement, LLC**

By: _____

Name: RANDY PARKER

Title:  Chief Operating Officer

17

# JG WENTWORTH®

March 13, 2024

Castro Law, LLC
Attn: Lori Leigh, Manager Member
2371 Huff Place
Highland, MI 48356

Richard K. Gustafson, II, Esq.
Managing Principal
Gustafson Legal, P.C.
2906 Central Street, Ste. 184
Evanston, IL  60201
Cell:  312-342-6200
*via email: rickg@gustafsonlc.com*

RE: Notice of Termination of February 21, 2022 Service Agreement *For Cause*

Dear Managing Member:

Pursuant to Section 3(c)(i) of the February 21, 2022 Service Agreement entered into between JGW Debt Settlement, LLC ("JGW") and Castro Law, LLC, JGW is terminating the subject Service Agreement for cause based on violations of the no advanced fee provisions of the Telemarketing Sales Rule at 16 CFR 310 *et seq*. (the "TSR") and on a receivership of associated law firms.

We understand from certain allegations that led to asset freezes of other law firms in which you associate, including Lori Leigh & Associates d/b/a Phoenix Legal, that your firm is collecting advanced fees associated with debt resolution work.

As part of the asset freeze in place, your law firm is subject to proceedings related to a receivership and the law firm is prohibited or materially impaired by law, regulation and disciplinary action from offering or providing debt negotiation legal services. These matters are directly addressed as a basis for termination of the Service Agreement with cause, as I highlight below. JGW strictly adheres to the no advanced fee provisions of the TSR. As a back-end service provider to your firm, JGW will not assist or facilitate in your firm or any other law firm collecting advanced fees for debt relief services under the TSR. The material breach cannot be cured nor can the asset freeze and so the termination is effective immediately.

**EXHIBIT 2**

> (c)   **Termination With Cause.** Each Party shall have the right to end this Agreement for Cause during the Term upon written notice to the other Party.
>
>> (i)   "Cause" by LAW FIRM is defined as any of the following: (A) material breach of this Agreement by LAW FIRM which, if capable of being cured, is not cured within thirty (30) days of written notice thereof; (B) LAW FIRM becomes the subject of a voluntary or involuntary petition in bankruptcy or any proceedings relating to insolvency, receivership or liquidation, admits in writing its inability to pay debts generally as they come due, makes an assignment for the benefit of creditors, or ceases to do business as a going concern; (C) LAW FIRM is prohibited or materially impaired by law, regulation or disciplinary action from offering or providing debt negotiation legal services to the Applicable Clients; or (D) LAW FIRM ceases to be licensed to perform the duties of LAW FIRM under this Agreement. "Cause" by SERVICER is defined as any of the following: (X) material breach of this Agreement by SERVICER which, if capable of being cured, is not cured within thirty (30) days of written notice thereof; (Y) SERVICER becomes the subject of a voluntary or involuntary petition in bankruptcy or any proceedings relating to insolvency, receivership or liquidation, admits in writing its inability to pay debts generally as they come due, makes an assignment for the benefit of creditors, or ceases to do business as a going concern; (Z) SERVICER is prohibited or materially impaired by law or regulation from offering or providing the Services to LAW FIRM and the Applicable Clients.
>
>> (ii)   Following a termination for Cause initiated by SERVICER, SERVICER shall have the option to continue to provide Services to all then-existing Applicable Clients in accordance with this Agreement in exchange for the applicable Fee for so long as SERVICER continues to provide Services in accordance with this Agreement, and such

While Section 3(c)(ii) of the Service Agreement allows JGW to continue servicing your firm's clients, JGW is severing ties completely. We will work with you to provide a back-up copy of all servicing notes as well as client documents, and will work in transitioning any servicing to another company should you desire to work with a third party. We are also willing to assist you with transitioning the firm's clients to Arnold & Smith, PLLC/LLP if they so desire.

JGW will abide by the Service Agreement's provision on Confidential Information found in Section 5 and will work cooperatively with any lawful requests for information. To the extent that JGW receives a request or is required to disclose any Confidential Information by any government or administrative unit or agency, it will alert you to the request or demand (assuming allowed to do so under the law). If your firm does not obtain any sort of protective order, JGW will share information and documents as required under the law.

Finally, pursuant to Section 6 of the Service Agreement, JGW demands to be reimbursed and indemnified for any loss, liability, obligation, fine, penalty, damage, deficiency or cost of third-party investigation, and any actions, judgments, fees, costs and expenses (including, but not limited to, reasonable attorneys' fees and costs) incurred in investigating, preparing for and defending any action, demand, proceeding, investigation or claim in connection with your firm's material breach of the Service Agreement as well as any other conduct of your operations or business prior to the Service Agreement.

JGW will not delay its termination of this Agreement now that it has learned about your law firm's practices.

Again, JGW will work cooperatively with your firm to transition the servicing of your clients to another service provider if you are not planning on directly servicing your clients. We can also provide back-up

files to the extent that you have not previously downloaded our activity. Please advise within the next five (5) days how you wish to proceed so that the clients are handled appropriately.

Sincerely,

Lori L. Lasher, Executive Vice President, GC, CLO and CCO
The J.G. Wentworth Company



Writer's Direct Dial: (630) 510-4910
telliott@rathjelaw.com

March 18, 2024

**VIA E-Mail**

Lori L. Lasher
Executive Vice President, GC, CLO and CCO
The J.G. Wentworth Company
llasher@jgwentworth.com

      RE:    *Castro Law, LLC*

Ms. Lasher,

Our firm represents Castro Law, LLC ("Castro") and I write in response to your March 13, 2024 letter (received on March 14, 2024). Please direct all future correspondence on this subject to my attention. In your March 13 letter, JGW Debt Settlement, LLC ("JGW") purports to terminate the Service Agreement with Castro "for cause." Your letter is factually and legally groundless.

For starters, the central contention of your letter is simply wrong. Castro has never been named as a defendant in any action involving asset freezes, appointment of a receiver, or allegations about collecting advance fees. Similarly, the "associated" law firm to which you refer (Phoenix Legal) has also never been named as a defendant in such a lawsuit. Frankly, we are surprised you would take such a drastic step, *i.e.*, termination for cause, without even a cursory investigation into the veracity of your claims.

In addition, your contention that Castro "is collecting advanced fees" is wrong. As you certainly must know, Castro does not charge advanced fees. It is a contingent fee law firm that complies fully with the Telemarketing Sales Rules, 16 CFR § 310 *et seq*. If you believe otherwise, we challenge you to produce evidence that Castro has collected advanced fees from any of its clients. You will not be able to produce any such evidence.

Your "termination for cause" argument finds no support in the Service Agreement. Under the Service Agreement, the "LAW FIRM" is a defined term and refers to Castro Law, LLC. None of the highlighted language in your letter is applicable to Castro Law, LLC. Castro has not: (1) materially breached the Service Agreement; (2) become the subject of a voluntary or involuntary petition in bankruptcy or had a receiver appointed; or (3) been prohibited or materially impaired by law, regulation or disciplinary action from providing services to clients.

For those reasons, JGW's claims of breach and invocation of Section 3(c) of the Service Agreement are entirely unfounded. To be clear, JGW has no legal or factual basis to stop performance under the Service Agreement.

**309 E. ROOSEVELT ROAD, SUITE 220, WHEATON, IL 60187**
Electronically Filed 05/01/2024 14:39 / CV-24-996865 / Confirmation Nbr: 3153583 / CLDLJ

**EXHIBIT 3**

The J.G. Wentworth Company
March 18, 2024
Page 2

      One other point of your letter merits mention. You suggest that JGW intends to "transition" Castro's clients to a different law firm, Arnold & Smith PLLC/LLP. Neither JGW nor any of its affiliates should do any such thing. Castro has an ongoing contractual relationship with its clients. Neither JGW nor Arnold & Smith has any right to interfere with those ongoing contractual relationships. If Castro discovers that any effort has been made to divert its clients to another law firm, it will not hesitate to take legal action.

      For the reasons set forth above, Castro demands that JGW immediately retract its purported termination, resume full performance under the Service Agreement, and resume providing service at the contractually-mandated levels for Castro's clients. If you have concerns about ongoing litigation or Castro's ability to provide service, we are happy to engage in discussions to address those concerns. There may be a scenario in which Castro is willing to transition its clients to a different servicing company, but any meaningful dialogue on that subject must occur while Castro's clients are being properly serviced and any transition must occur in an orderly fashion. Your March 13 letter is not a productive step in that direction.

      If JGW is not willing to retract its letter and resume service, we will be compelled to view your "severing ties completely" as an anticipatory repudiation of the Service Agreement entitling Castro to significant damages, including attorney's fees and lost profits. *See Veloric v. J.G. Wentworth, Inc.*, C.A. No. 9051-CB, 2014 WL 4639217 (Del. Ch. June 25, 2014). If that occurs, Castro will seek significant damages, including any damages caused by JGW's wrongful termination and any lost profits that arise if JGW and its affiliates fail to meet the required 75% enrollment figure through February 21, 2025 (subject to semi-annual audit). *See* Serv. Agmt. at § 1(h)(i).

      We believe time is of the essence with respect to this matter. Accordingly, please provide us with JGW's position by Tuesday, March 19, 2024. If you have any questions or wish to discuss this matter further, please contact me.

                    Sincerely,

                    /s/ Timothy D. Elliott

                    Timothy D. Elliott

# Greenspoon Marder LLP

Richard W. Epstein, Partner
200 East Broward Boulevard, Suite 1800
Fort Lauderdale, Florida 33301
Phone: 954.491.1120
Fax: 954.771.9264
Direct Fax: 954.343.6958
Email: richard.epstein@gmlaw.com

March 21, 2024

Timothy D. Elliott, Esq.
Rathje Woodward
300 E. Roosevelt Road
Suite 220
Wheaton, IL 60187
*via email telliott@rathjelaw.com*

Re:     JG Wentworth/Castro Law, LLC
        Our matter: 61450.0026

Dear Tim:

Greenspoon Marder represents JG Wentworth. While our client appreciated your March 18, 2024 letter, it can change nothing. Castro Law, LLC's Service Agreement with JGW Debt Settlement, LLC ("JGW") is terminated for cause, with immediate effect.  JGW will not recede from that position.

You point to the filings in *CFPB v. Straifs, LLC, et al.* to demonstrate that Castro Law, LLC is neither a named defendant, relief defendant or an intervenor. All true. But that overly parses the landscape of the case.  Leigh Legal Group, PLLC (presumably associated with Lori Leigh, the managing member of Castro Law), is an intervenor and admittedly associated with the PI, Receivership and asset freeze defendants. And Jason Blust, a defendant, and Rick Gustafson, indisputably associated with the defendants in the case, have been contact persons for Castro Law. Castro Law's association with the actors sued by the CFPB is unmistakable.

JGW will not be associated with anyone or anything that exists within the universe of companies and people connected to that case.  The Termination with Cause provision to which Lori Lasher pointed applies, and JGW's contractual commitments which survive the termination of the Service Agreement outlined by Ms. Lasher stand.

That said, JGW has already offered to cooperate in a transition to an alternative servicer. That offer remains open, but not for long. If Arnold & Smith, PLLC/LLP is not an acceptable replacement, then JGW must know Castro Law's chosen successor servicer by 5 o'clock pm EDT Tuesday, March 26, 2024, or all service will cease the

Electronically Filed 05/01/2024 14:39 / / CV 24 996863 / Confirmation Nbr. 3155863 / CLDLJ

**EXHIBIT 4**

Timothy D. Elliott, Esq.
March 21, 2024
Page No. 2

opening of business Wednesday March 27, 2024. JGW will send whatever notices to customers and others the Service Agreement requires.

Tim, I have availability to discuss this mid-afternoon or later today and Friday (but not Monday). So tell me if you want to meet, with several date and time options, and we'll send a Teams invite. But this discussion will be limited to transition, not reconsideration.

Trust you are well.


Very truly yours,

GREENSPOON MARDER LLP

*/s/ Richard W. Epstein*

Richard W. Epstein, Partner


cc: Lori L. Lasher, Esq.

| | |
|---|---|
| **From:** | Richard Epstein |
| **To:** | Timothy D. Elliott; Emily Shupe |
| **Cc:** | Robby Birnbaum; {F16337921}.Active@gmlaw.imanage.work |
| **Subject:** | 61450.0026 JGW/Castro [IMAN-ACTIVE.FID16337921] |
| **Date:** | Monday, April 1, 2024 5:08:07 PM |
| **Attachments:** | image002.png |

**Tim: as we discussed, JG Wentworth has re-evaluated the transfer of the Castro Law files, focusing on the impact and impression the transition of active files will have on the Castro Law clients. Both JGW and Castro are associated with the clients and identified to those files, and a disruption in the administration of their debt settlement program will likely cause client concerns that JGW believes we should jointly avoid. So, as I said during our call, JGW proposes that it will continue to service the existing Castro clients through the conclusion of their programs. As this arrangement would be limited to only existing Castro clients, Castro Law will need to separately arrange for servicing of newly engaged clients.**

**I look forward to speaking with you tomorrow.**

Richard W. Epstein

# GreenspoonMarder LLP 40
### CELEBRATING FORTY YEARS TOGETHER

200 East Broward Boulevard
Suite 1800
Fort Lauderdale, Florida 33301
Telephone: 954.491.1120
Direct Facsimile: 954.343.6958
Mobile: 954.214.5624

GREENSPOON MARDER LLP LEGAL NOTICE
The information contained in this transmission may be attorney/client privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by reply e-mail.

**EXHIBIT 5**

Unless specifically indicated otherwise, any discussion of tax issues contained in this e-mail, including any attachments, is not, and is not intended to be, "written advice" as defined in Section 10.37 of Treasury Department Circular 230.

A portion of our practice involves the collection of debt and any information you provide will be used for that purpose if we are attempting to collect a debt from you.



Writer's Direct Dial:  (630) 510-4910
telliott@rathjelaw.com

April 19, 2024

**VIA E-Mail**

Richard W. Epstein
Greenspoon Marder LLP
Counsel for the JGW Debt Settlement, LLC
richard.epstein@gmlaw.com

      RE:    *Castro Law, LLC*

Dear Richard,

      As you are aware, our firm represents Castro Law, LLC ("Castro"). As we have previously discussed, Castro views JGW Debt Settlement, LLC's ("JGW") March 13, 2024 letter as a repudiation of the Service Agreement between Castro and JGW. As you know, in response to JGW's actions, Castro was forced to secure a new servicing vendor, NF Financial. JGW initially cooperated in the transition to NF Financial but subsequently indicated its intent to continue servicing Castro clients despite its purported termination and repudiation.

      Please be advised that, effective immediately, based on JGW's repudiation, JGW is no longer authorized by Castro to operate as a servicer of Castro's clients. As of today, all of Castro's clients have been transitioned to NF Financial. To be clear, JGW no longer has any relationship with Castro or its clients and is not authorized to communicate with or perform services for Castro's clients. Castro has instructed its attorneys to refrain from interacting with JGW. Castro's supervising attorney assigned to JGW has been removed. Consequently, we caution that any services performed by JGW with respect to Castro's clients may constitute the unauthorized practice of law.

      Pursuant to Section 5 of the Service Agreement, and your previous assurances that JGW would "work cooperatively" to transition Castro's clients, Castro requests the immediate return of all Confidential Information. Castro further requests that JGW cooperate with Castro and CFT to provide NF Financial immediate access to Castro's client data. Castro will take all necessary steps to facilitate the prompt and secure return of its Confidential Information, and expects a prompt follow up on the process to be employed for returning this information.

      It goes without saying that time is of the essence in this transition. Castro cannot allow its clients to encounter service disruptions. Based on our prior discussions, we are expecting full cooperation and a high degree of professionalism in connection with this transition. However, if such cooperation is not forthcoming, Castro stands ready to initiate an action in the parties' chosen venue of Cleveland, Ohio.

      Castro further demands that JGW preserve all documents relating to its dealings with Castro and its purported termination of Castro as required under the Ohio Rules of Civil Procedure

**309 E ROOSEVELT ROAD, SUITE 220, WHEATON, IL 60187**

**EXHIBIT 6**

Richard Epstein
April 19, 2024
Page 2

(and all federal and state analogs) related to JGW's repudiation. If you have any questions or wish to discuss this matter further, please contact me.

Sincerely,

/s/ Timothy D. Elliott

Timothy D. Elliott

# GreenspoonMarder LLP

Richard W. Epstein, Partner
200 East Broward Boulevard, Suite 1800
Fort Lauderdale, Florida 33301
Phone: 954.491.1120
Fax: 954.771.9264
Direct Fax: 954.343.6958
Email: richard.epstein@gmlaw.com

April 23, 2024

*Via email only*
Timothy D. Elliott, Esq.
Rathje Woodward
300 East Roosevelt Road
Suite 200
Wheaton Il  60187

Re:    JG Wentworth/Castro Law
       Our File No.  61450.0026

Dear Tim:

I received your April 19 letter while out of the office on a family emergency and have now forwarded it to JG Wentworth. Under the Servicing Agreement, since Castro Law was terminated for cause, per § 3(c)(ii) JG Wentworth contractually retains servicing and your client has no authority to do what your letter threatens. So the purported transition of the accounts is rejected.

Castro Law owes JG Wentworth earned fees of **$454,381** as fees for the settlements that were achieved for Castro Law customers while JG Wentworth serviced these accounts. Such monies are fully earned per § 3(c)(iii). Your client knows that JG Wentworth's fees were paid pro rata from the customers' term payments debits rather than, as is customary, at the time of the settlement and first term payment. This money is unquestionably due to JG Wentworth and, if JG Wentworth is to forego servicing the accounts with these active term settlements, it insists that it should be paid now. This is now the obstacle to a more collaborative resolution of this matter. We can provide greater detail supporting this sum upon request.

JG Wentworth will coordinate the prompt transition of the accounts upon the payment of **$454,381**. We can provide your client payment instructions upon an agreement to these terms.

Electronically Filed 05/01/2024 14:39 /  / CV 24 996863 / Confirmation Nbr. 3155863 / CLDLJ

**EXHIBIT 7**

Timothy D. Elliott
April 23, 2024
Page No. 2

Your threat of litigation fails to account for the debt your client owes for the services JG Wentworth has already performed and fees that it has already earned. That is not a path your client wants to travel.  Have them pay JG Wentworth what they know is due and this matter will be over.


Very truly yours,

GREENSPOON MARDER LLP

/s/ *Richard W. Epstein*

Richard W. Epstein, Partner

Motion No.  <u>5167317</u>



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**MOTION FOR TEMPORARY RESTRAINING ORDER**
**May 2, 2024 20:58**

By: ELLIOTT MARQUIS YOUNG 0074275

Confirmation Nbr. 3157406

CASTRO LAW, LLC                                    CV 24 996863

vs.

JGW DEBT SETTLEMENT, LLC          **Judge:**  RICHARD A. BELL

**Pages Filed:**  24

## IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY
## GENERAL DIVISION

| | | |
|---|---|---|
| CASTRO LAW, LLC, | ) | CASE NO. CV-24-996863 |
| | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE RICHARD A. BELL |
| | ) | |
| v. | ) | PLAINTIFF CASTRO LAW, LLC'S |
| | ) | MOTION FOR TEMPORARY |
| JGW DEBT SETTLEMENT, LLC | ) | RESTRAINING ORDER AND |
| | ) | PRELIMINARY INJUNCTIVE |
| | ) | RELIEF |
| | ) | |
| Defendant. | ) | |

Plaintiff Castro Law, LLC ("Castro") respectfully moves this Court, pursuant to Rule 65 of the Ohio Rules of Civil Procedure, for a Temporary Restraining Order and Preliminary Injunction: (1) requiring Defendant JGW Debt Settlement, LLC to immediately return all Castro Confidential Information; (2) requiring Defendant JGW Debt Settlement, LLC to immediately provide Castro and NF Financial with access to the Applicable Client data that is maintained in Debt Manager and/or any other electronic platform to which Defendant JGW Debt Settlement, LLC has exclusive access; and (3) barring Defendant JGW Debt Settlement, LLC and its agents, employees, contractors, vendors, members, managers, and any other person or entity acting on behalf of or at the direction of Defendant JGW Debt Settlement, LLC from communicating with Castro's Applicable Clients.

As set forth in the attached Memorandum in Support and the Complaint, Castro possesses a contractual right to its confidential information and client data,

and it has a right to conduct its client relationships without interference from Defendant JGW Debt Settlement, LLC. Notwithstanding these clear rights, Defendant JGW Debt Settlement, LLC has wrongfully withheld Castro's confidential and client information, and Defendant JGW Debt Settlement, LLC has continued to communicate with Castro's clients despite clear directives to cease such communications. Accordingly, Castro seeks the requested injunctive relief from this Court in order to enforce its rights.

Dated: May 2, 2024

Respectfully submitted,

 /s/ E. Mark Young
E. Mark Young (0074275)
Roetzel & Andress, LPA
1375 E. 9th Street
One Cleveland Center, 10th Floor
Cleveland, Ohio 44114
Phone:      (216) 623-0150
Facsimile: (216) 623-0134
Email: emyoung@ralaw.com

And

John J. Rutter (0079186)
Roetzel & Andress, LPA
222 S. Main Street
Akron, OH  44308
Ph:  (330) 849-6713
Fax:  (330) 376-4577
Email: jrutter@ralaw.com

And

Emily Shupe (PHV No. 15009-2023)
Rathje Woodward LLC
300 East Roosevelt Road
Suite 300
Wheaton, Illinois 60187
Ph:  (630) 510-4930
Email:  eshupe@rathjelaw.com

*Attorneys for Plaintiff Castro Law, LLC*

**IN THE COURT OF COMMON PLEAS**
**CUYAHOGA COUNTY**
**GENERAL DIVISION**

| | | |
|---|---|---|
| CASTRO LAW, LLC, | ) | CASE NO. CV-24-996863 |
| | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE RICHARD A. BELL |
| | ) | |
| v. | ) | PLAINTIFF CASTRO LAW, LLC'S |
| | ) | MEMORANDUM IN SUPPORT OF |
| JGW DEBT SETTLEMENT, LLC | ) | ITS MOTION FOR TEMPORARY |
| | ) | RESTRAINING ORDER AND |
| | ) | PRELIMINARY INJUNCTIVE |
| | ) | RELIEF |
| | ) | |
| Defendant. | ) | |

## I.    **INTRODUCTION**

Castro Law, LLC ("Castro") is a law firm. In 2022, Castro entered into a written contract with JGW Debt Settlement LLC ("JGW") wherein JGW agreed to provide certain customer service and administrative support services to assist Castro in representing its clients. Under that agreement (the "Agreement"), JGW received access to confidential information pertaining to Castro's clients. JGW was also charged with inputting significant amounts of confidential information into various electronic databases used by Castro and/or JGW.

In March 2024, JGW suddenly announced that it was, "without delay," terminating the Agreement "for cause" and "severing ties completely" with Castro. JGW's purported for-cause termination was (and remains) a repudiation of the Agreement. When JGW refused to reconsider that termination, Castro was compelled

to find a replacement for JGW. Castro acted promptly and entered into a contract with National Fidelity Financial ("NF Financial").

But JGW has not cooperated with the transition to NF Financial. Despite repeated demands, JGW has refused to return Castro's client data or provide same to NF Financial. And JGW continues to communicate with Castro's clients – despite clear instructions from Castro not to do so. JGW has indicated that it believes it has significant money damages claims against Castro and has suggested it will turn over Castro's client data *after* resolution of its money damages claims. Even worse, Castro has recently become aware that JGW is now contacting Castro clients and advising them of the "option" to terminate Castro and retain a different law firm.

Castro cannot tolerate ongoing tortious interference by a terminated vendor. More importantly, Castro cannot allow its clients to be placed in jeopardy as a result of JGW's actions. Castro needs to be able to provide litigation support and debt resolution services to its clients.  It cannot do so effectively while JGW withholds information. Moreover, Castro is deeply concerned about the implications of a now-terminated vendor (JGW) communicating with Castro's clients without any supervision or direction from Castro's attorneys. JGW lacks any authority to engage in such communications and such conduct may constitute the unauthorized practice of law. This Court should enter a temporary restraining order that compels JGW to: (1) cease communication with Castro's clients; and (2) immediately take all actions necessary to turn over information pertaining to Castro's clients to Castro and/or NF Financial.

One additional point merits mention. Castro contends that JGW has repudiated the Agreement and will seek money damages (and perhaps other relief) arising from that repudiation. It seems clear that JGW also contends that Castro has breached the Agreement. The Agreement contains dispute resolution provisions that call for disputes between Castro and JGW to be resolved via mandatory mediation and then mandatory arbitration. Castro intends to abide by those provisions. Indeed, Castro has already asked JGW to submit to mediation as required under the Agreement. If mediation fails, Castro is prepared to proceed to arbitration.

However, the mediation and arbitration process will take weeks, if not months. Castro's clients should not be placed in jeopardy while those claims are being resolved. Castro must have the ability to fully represent its clients without interference or disruption caused by its former vendor, JGW. Thus, Castro is petitioning this Court for narrow relief, *i.e.*, temporary injunctive relief during the pendency of mandatory mediation and arbitration proceedings pursuant to Section 3 of the Federal Arbitration Act. 9 U.S.C. § 3. If the parties' dispute proceeds to arbitration and an arbitrator is appointed, the appointed arbitrator can then address the propriety of any continued injunctive relief.

## II.     FACTUAL BACKGROUND

### A.     Castro Law LLC.

Plaintiff Castro Law, LLC is a law firm that represents clients in various states (including Ohio) who are looking for ways to reduce their debt burden. (Affidavit of

Lori Leigh is attached hereto as **Exhibit A**, at ¶ 3).[1] Castro represents clients in two basic areas: (1) providing litigation defense in collection suits filed by clients' creditors; and (2) negotiating compromises of its clients' unsecured debts. (*Id.*) Castro has member-attorneys in a number of states. (*Id.*) Lori Leigh is one such member. (*Id.* at ¶¶ 1, 3.) Leigh is licensed to practice law in Michigan and is the managing member and majority owner of Castro. (*Id.* at ¶ 1.) Leigh is also a member of other law firms as well, including Phoenix Legal Group ("Phoenix") and Leigh Law Group, PLLC (d/b/a Greenstone Legal Group and hereinafter "Greenstone"). (*Id.* at ¶¶ 10-11.)

Castro is a contingent-fee law firm. (*Id.* at ¶ 5.) It does not charge fees to a client until the law firm is able to negotiate compromises of at least some of the client's debt. (*Id.*; *id.* at **Exhibit A-1** (Exemplar Retainer Agreement)). Thus, Castro's clients pay Castro a set percentage (generally 27%) of the amount of each of the debts for which the client retains Castro (the "Performance Fee"). (*Id.* at ¶ 5; *id.* at Exhibit A-1 § 2.1, **Exhibit A-2** § 2(a) (Service Agreement). However, Castro receives the Performance Fee payments from its clients only ***after*** it has settled a particular debt. (*Id.*; *id.* at Ex. A-1 § 2.3).

When a client retains Castro, they execute a retainer agreement. (*Id.* at ¶ 4; *id.* at Ex. A-1).  The client also executes a separate agreement with CFTPay by which the client establishes a "special purpose account" via the CFTPay platform. (*Id.* at ¶ 4; *id.* at Ex. A-1, pp. 41-46 (CFTPay Agreement).) That account is in the name of, and

---

[1] Tthe exhibits associated with Ms. Leigh's Affidavit (Exhibit A) are labeled Exhibit A-1 *et seq*.

7

held by, the client. (*Id.* at ¶ 4.) Typically, a Castro client makes monthly payments into their CFT special purpose account. (*Id.*) Funds accumulate in that account and are used to pay settlements with creditors and, when appropriate, Castro's fees. (*Id.*)

Castro's attorneys and employees handle litigation defense and debt negotiations with creditors. (*Id.* at ¶ 6.) However, via the Agreement, Castro outsourced the vast majority of its administrative work to JGW. (*Id.* at ¶ 6; *id.* at Ex. A-2.) Such work includes non-legal customer service issues, answering clients' non-legal questions, setting up term settlement payment schedules, handling client requests to change payment schedules, gathering documents from clients, client file maintenance, scanning documents, and other similar administrative tasks. (*Id.*)

One key task handled by JGW is processing settlements for Castro's clients. (*Id.* at ¶ 7.) When Castro reaches a settlement on behalf of a client, the settlement details are communicated to JGW. (*Id.*) JGW then sets up a payment plan through CFTPay. (*Id.*) However, JGW uses a different CFT-related product, Debt Manager, to do so. (*Id.*) The license and credentials for Debt Manager are held by JGW, not Castro. (*Id.*) While Castro has its own license and credentials for the CFTPay platform (through which it can view clients' account balances and transaction information), it does not have access to Debt Manager, in which Castro's clients' settlement payment details are maintained. (*Id.*)

## B.    Castro's Agreement With JGW.

On or about February 21, 2022, Castro and JGW entered into the Agreement by which JGW agreed to provide, and Castro agreed to pay for, certain support

services (the "Support Services") to Castro Applicable Clients. (Aff. Leigh at Ex. A-2

at § 1(c)). Under the Agreement, "Applicable Clients" are defined as:

> [T]hose clients of [Castro] at any particular time who (i) were introduced
> to [Castro] by [JGW] or otherwise pre-screened by [JGW], (ii) have
> executed a retainer agreement with [Castro] for consumer debt
> negotiation legal representation, and (iii) are clients in good standing of
> [Castro] at such time of determination pursuant to the terms of such
> retainer agreement.

(*Id.* at § 1(b)).  Support Services include, *inter alia*, the following:

> The provision of administrative non-legal services as primary support
> staff of [Castro] in connection with [Castro's] consumer debt negotiation
> legal services business, including, but not limited to, facilitating
> execution by prospective Applicable Clients of [Castro's] retainer
> agreement and associated enrollment documents, Applicable Client
> enrollment, compliance with prospective client qualification criteria,
> client support, client fee accounting, assistance with financial workout
> analysis, general administrative support and payment processor
> support, and assistance regarding the establishment and maintenance
> of efficient processes and criteria in the engagement of creditors and
> collectors in an effort to modify and settle Applicable Clients' enrolled
> debts[.]

(*Id.* at § 1(c)(iii)). In exchange for the Support Services, Castro agreed to pay JGW

fees in an amount equivalent to 18.9% of the enrolled amount of the settled debt, upon

resolution of that particular debt, for Applicable Clients. (*Id.* at § 2(c)).

The Agreement has a three-year term (*i.e.*, through February 20, 2025) and

provides that it may be terminated only by: (a) non-renewal; or (b) for cause. (*Id.* at

§§ 3(a)-(c)). With respect to Castro, "cause" for termination is defined as:

> (A) material breach of this Agreement by [Castro], which, if capable of
> being cured, is not cured within thirty (30) days written notice thereof;
> (B) [Castro] becomes the subject of a voluntary or involuntary petition
> in bankruptcy or any proceedings relating to insolvency, receivership or
> liquidation, admits in writing its inability to pay debts generally as they
> come due, makes an assignment for the benefit of creditors, or ceases to

do business as a going concern; (C) [Castro] is prohibited or materially impaired by law, regulation, or disciplinary action from offering or providing debt negotiation legal services as to the Applicable Clients; or (D) [Castro] ceases to be licensed to perform the duties of [Castro] under this Agreement.

(*Id.* at § 3(c)(i)). Upon a termination for cause by JGW, JGW had the option to continue to provide the Support Services to Applicable Clients, provided that such Support Services continued to be supervised by a Castro attorney. (*Id.* at § 3(c)(ii)).

The Agreement also provides substantial protections for "Confidential Information." Under the Agreement, "Confidential Information" is broadly defined as "all non-public information of [JGW, Castro] or Applicable Clients (whether written, oral or in another medium) provided by a Party or an Applicable Client, or of which a Party comes into possession, and all notes, analyses or other material prepared by a Party containing or based, in whole or in part, on any such Confidential Information." (*Id.* § 5(a)(i)). Under the Agreement, JGW could use Confidential Information of Castro and the Appliable Clients solely for the "Purpose" of the Agreement, which is defined as "the facilitation of [JGW]'s continuing provision of [Support] Services under [the] Agreement[.]" (*Id.* at §§ 5(a)(ii), 5(c)(i)).

The Agreement further provides that, upon written demand, all Confidential Information shall be returned, and all copies destroyed, within ten days of such demand. (*Id.* § 5(g)). The parties specifically agreed that the protections for Confidential Information were critically important:

> ***Notwithstanding Section 8(j) [Mediation and Arbitration] hereof***, each of [Castro] and [JGW] acknowledges that (i) the protections set forth in this Section 5 are of vital concern to the Parties, (ii) any violation hereof would cause irreparable harm to the other Party, (iii)

monetary damages for any violation hereof would not be adequate compensation, (iv) the restrictions set forth herein will not prevent either [Castro] or [JGW] from conducting business, and (v) the covenants set forth herein are a vital part of the negotiations between the Parties and that no Party would have entered into this Agreement without agreement thereto. Accordingly, each of [Castro] and [JGW] agrees that the restrictions set forth in this Section 5 are reasonable in terms of duration and scope and that, in addition to any other remedy, ***such restrictions may be enforced by injunction proceedings (without the necessity of posting bond) to preserve the status quo, restrain a violation thereof and to compel specific performance with respect thereto, whether or not this Agreement has terminated.***

(*Id.* at § 5(i) (emphasis added.)

## C.   JGW Repudiates The Agreement.

The parties operated under the Agreement for over two years. On March 13, 2024, JGW sent a letter to Castro by which it informed Castro that it was "terminating the…Agreement <u>for cause</u> based on violations of the no advanced fee provisions of the Telemarketing Sales Rule at 16 CFR 310 *et seq.* (the "TSR") and on a receivership of associated law firms."  (Aff. Leigh at **<u>Exhibit A-3</u>** (JGW March 13, 2024 Letter). Therein, JGW informed Castro that it was "severing ties completely" and that "JGW [would] not delay its termination of the Agreement[.]" (*Id.* at pp. 1-2.) However, JGW committed to "abide by the…Agreement's provision on Confidential Information found in Section 5" of the Agreement. (*Id.* at p. 2.) JGW also committed to "work cooperatively with [Castro] to transition the servicing of [Castro's] clients to another service provider if [Castro was] not planning on directly servicing [its] clients." (*Id.*) JGW also committed to "provide back-up files to the extent that [Castro had] not previously downloaded [JGW's] activity." (*Id.* at pp. 2-3.)

On March 18, 2024, Castro responded and pointed out the factual inaccuracies of JGW's position. (Affidavit of Emily Shupe is attached hereto as **Exhibit B**, at **Exhibit B-1** (March 18, 2024 Rathje Woodward, LLC Letter) attached thereto).[2] Specifically, Castro advised JGW that Castro "has never been named as a defendant in any action involving asset freezes, appointment of a receiver, or allegations about collecting advance fees."  (*Id.* at p. 1.) Castro also informed JGW that the purported "associated law firm," Phoenix, was not named as a defendant in any such action. (*Id.*) Castro also reminded JGW that Castro only collected fees on a contingent basis. (*Id.*)

Despite that communication, JGW did not retreat. Rather, JGW doubled down on its position and informed Castro that it was terminating the Agreement "for cause, with immediate effect" and noted that "JGW will not recede from that position."  (Aff. Shupe at **Exhibit B-2** (March 21, 2024 Greenspoon Marder Letter)). JGW noted that Greenstone was an intervenor in the referenced action. (*Id.*) JGW demanded that Castro provide it with the identity of its chosen successor servicer by the close of business on March 26, 2024. (*Id.* at p. 2.) JGW also asserted that it would cease all servicing by April 1, 2024. (*Id.* at p. 1.) JGW reiterated its commitment to "cooperation in a transition to an alternative servicer," but noted that any "discussion would be limited to transition, not reconsideration." (*Id.* at pp. 1-2.)

As a result of JGW's actions, Castro was forced to move quickly and transition its clients from JGW to a new servicer. (Aff. Leigh at ¶ 9). To that end, Castro engaged

---

[2] The exhibits associated with Ms. Shupe's Affidavit (Exhibit B) are labeled Exhibit B-1 *et seq*.

NF Financial to provide the Support Services to its clients. (*Id.*) On March 25, 2024, Castro informed JGW that it would transition the Support Services to NF Financial and that it was prepared to do so by JGW's previously demanded date of April 1, 2024. (Aff. Shupe at ¶ 6, **Exhibit B-3** (JGW March 25, 2024 email)). Castro advised JGW that it expected JGW to turn over all client information to the new servicer, including the information maintained in Debt Manager. (Aff. Leigh at ¶ 9.)

JGW initially cooperated with the transition of the Support Services to NF Financial. However, on April 1, 2024, JGW informed Castro that it had "re-evaluated the transfer" and wanted to "continue to service the existing Castro clients through the conclusion of their programs." (Aff. Shupe at ¶ 7, **Exhibit B-4** (Counsel for JGW's April 1, 2024 email)). JGW then refused to provide Castro and NF Financial with access to Castro's own client data, including information provided by and pertaining to Applicable Clients. (Aff. Leigh at ¶ 9.) JGW also continued to communicate with Applicable Clients, despite Castro's express direction to cease all such communications and servicing, and instead transition those functions to NF Financial.

On April 19, 2024, Castro demanded that JGW cease and desist from communication with its clients, and demanded the immediate return of Castro's Confidential Information pursuant to Section 5 of the Agreement:

> Pursuant to Section 5 of the…Agreement, and your previous assurances that JGW would 'work cooperatively' to transition Castro's clients, Castro requests the immediate return of all Confidential Information. Castro further requests that JGW cooperate with Castro and CFT to provide NF Financial immediate access to Castro's client data.

(Aff. Shupe at ¶ 8, **Exhibit B-5** (April 19, 2024 Letter from Castro's counsel to JGW's counsel). JGW did not comply. Instead, it responded on April 23, 2024 and stated that it would hold the Confidential Information hostage until it was paid nearly half a million dollars for undefined and unsubstantiated "fees." (Aff. Shupe at ¶ 9, **Exhibit B-6** (April 23, 2024 Letter from JGW's counsel to counsel for Castro)).

As of May 1, 2024, JGW has not returned Castro's Confidential Information. (Aff. Leigh at ¶ 9.) Without the Confidential Information, Castro cannot effectively transition the Support Services for its clients to NF Financial, which severely hampers harm to Castro's ability to effectively and efficiently serve its clients by settling their debts. (*Id.*)

## III.   LAW AND ARGUMENT

### A.   Legal Standards For Temporary Restraining Order And Preliminary Injunction.

In deciding whether injunctive relief is appropriate under Rule 65 of the Ohio Rules of Civil Procedure, the Court must consider four factors: (1) whether the plaintiff has a strong likelihood of success on the merits, (2) whether the plaintiff would suffer irreparable injury without an injunction, (3) whether issuance of the injunction would cause substantial harm to others, and (4) whether the public interest would be served by issuance of the injunction. *See Corbett v. Ohio Bldg. Auth.*, 86 Ohio App.3d 44, 49 (10th Dist. 1993). In determining whether to grant injunctive relief, no one factor is dispositive; rather, the court must engage in a balancing of these factors. *See Cleveland v. Cleveland Elec. Illum. Co.*, 115 Ohio App.3d 1, 14 (8th Dist. 1996). As the balance of these four factors clearly favors Castro,

the Court should grant a temporary restraining order and a preliminary and permanent injunction.

**B.    Castro Has A Strong Likelihood Of Success On The Merits.**

      **1.    Castro Is Likely To Prevail On Its Repudiation Claim.**

The Agreement has a Delaware choice of law provision. (Aff. Leigh at Ex. 1 at § 8(e)). Under Delaware law, "repudiation is an outright refusal by a party to perform a contract or its conditions entitling 'the other contracting party to treat the contract as rescinded.'" *CitiSteel USA, Inc. v. Connell Ltd. P'ship*, 758 A.2d 928, 931 (Del. 2000); *Titan Inv. Fund II, LP v. Freedom Mortg. Corp.*, 58 A.3d 984 (Del. 2012). Under that standard, JGW has unquestionably repudiated the Agreement.

On March 13, 2024, JGW purported to "terminate" the Agreement and unequivocally stated that it was "severing ties completely" with Castro and would no longer provide the Support Services. (Aff. Leigh at ¶ 6, Ex. B-3.) JGW reiterated that position on March 21, 2024, when it informed Castro that it would "not recede from [its] position" and that any further discussions between the parties would be "limited to transition, not reconsideration." (Aff. Shupe at ¶ 5, Ex. B-2.) JGW's efforts to invent a "cause" for termination are without effect.

Indeed, the grounds for termination set forth in the March 13 JGW Letter have no basis in fact. As JGW knows, Castro does not take advance fees from its clients. Rather, all fees are paid on a contingent basis as debts are settled. Nor is Castro subject to any receivership or asset freeze. And finally, Castro is not a defendant in

the action referenced by JGW. *See Con. Fin. Prot. Bureau v. StratFS, LLC*, Case No. 24-cv-40 (W.D.N.Y.) ("*CFPB/StratFS*").

Castro's purported basis for termination is a flawed exercise in guilt by association. The *CFPB/StratFS* matter involves several law firms that are structured similarly to Castro, and an entity (StratFS) that provides services to law firms similar to those provided by JGW in this case. Lori Leigh is a member of one of those law firms (Greenstone). But there is a critical distinction between the parties in the *CFPB/StratFS* case and the parties in this case: Castro is a contingent fee law firm, and the law firms in *CFPB/StratFS* all charged advance retainer fees.

That distinction is all-important because the plaintiffs' chief claim in the *CFPB/StratFS* case (and the only claim at issue in that court's TRO and preliminary injunction rulings) is that those law firms' charging of ***advance fees*** was improper. The plaintiffs in that case argued (and the trial court ***preliminarily*** found) that those law firms should have been charging ***contingent fees***. In short, Castro already uses the fee structure that was found to be appropriate in the *CFPB/StratFS* action. As such, Castro has not been "materially impaired by law, regulation, or disciplinary action from, offering or providing debt negotiation legal services." Indeed, there has been no such finding by any court, regulatory body, or disciplinary authority.

Similarly, the "associated law firm" referenced in the March 13 JGW Letter, Phoenix, is not a defendant ***or*** an intervenor in the *CFPB/StratFS* case (or any other such case), is not subject to a receiver or asset freeze, has not received any adverse findings from a court, regulatory body, or disciplinary authority that "materially

impairs" its ability to practice law, and has no relationship with JGW. While Greenstone is an intervenor in the *CFPB/StratFS* case, it is not subject to the receivership or asset freezes, and it has not been the subject of any final rulings on the merits. Greenstone may not take advance fees from its clients during the pendency of that case. That does not "materially impair" Greenstone's ability to represent its clients. What's more, even if it did, Greenstone has no relationship with JGW.  Under the Agreement, the relevant consideration is whether ***Castro's*** ability to practice law has been materially impaired. JGW does not claim as much.

Moreover, even if JGW somehow ***believed*** that it had meritorious grounds to declare a breach, JGW is not entitled to repudiate where meritorious grounds do not exist.  "A party's good faith belief that the other is already in breach of the agreement does not privilege a party to repudiate its obligations." *HIFN, Inc. v. Intel Corp., No. CIV.A.* 1835-VCS, 2007 WL 1309376, at *14 (Del. Ch. May 2, 2007). "[A] party acts at his peril if, insisting on what he mistakenly believes to be his rights, he refuses to perform his duty." *Id. quoting Restatement (Second) of Contracts* § 250 (1981), cmt. d, at 274–75 (1981).

Similarly, any attempted "retraction" of its repudiation is without effect. Once a party demonstrates its outright refusal to perform, subsequent actions do not cure that repudiation. *See, e.g., Titan Inv. Fund II, LP v. Freedom Mortg. Corp.*, 58 A.3d 984 (Del. 2012) (finding that email sent to principal manager of real estate investments on behalf of mortgage bank informing investment manager that bank would "do no more work" on investment contract between the parties constituted a

repudiation of contract and later emails did not affect that repudiation). Accordingly, Castro is entitled to declare that JGW is in total breach of the Agreement and transition the Support Services to a new servicer. (Ex. A at Ex. A-2 § 3(c)(i), 3(c)(iii)). Castro is likely to prevail on the merits of its repudiation claim.

### 2. Castro Is Likely To Prevail On The Merits Of A Breach Of Contract Claim.

Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a resulting damage to the plaintiff. *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129 (Del. Ch. 2003). Here, again, Castro easily satisfies that standard.

*First,* there is no dispute that the Agreement is a valid and enforceable contract. That Agreement requires JGW to: (1) only use Confidential Information for purposes of continued Support Services under the Agreement; and (2) return all Confidential Information (including that of Castro's Applicable Clients) within 10 business days of the demand therefor. (Aff. Leigh at Ex. A-2, §§ 5(a)(ii), 5(c)(i), 5(g)).

*Second,* JGW has refused to return Castro's client information, and it has refused to cooperate in good faith with the transition of the Support Services to a new provider, as required by Sections 3(c)(iii) and 5(g) of the Agreement. Specifically, JGW has refused to provide either Castro or NF Financial with access to the Applicable Client information that is maintained in JGW's Debt Manager platform with CFTPay. That Debt Manager platform contains critical information regarding Castro's clients' settlement payment plans, schedules, and amounts due.

***Third,*** JGW has further breached the Agreement by continuing to communicate with Castro's clients regarding their representation, despite express instructions from Castro to cease and desist such communications. Here, again, JGW is not entitled to continue servicing those clients, but rather is obligated to "work in good faith to transition the provision" of Support Services to the new provider. (Aff. Leigh at Ex. A-2, § 3(c)(iii)). JGW has not done so.

***Fourth,*** Castro and its clients have been damaged by JGW's breaches. Without access to all client information, Castro is unable to fully represent its clients. For example, if a client requires changes to their settlement payment schedule or amounts, Castro is unable to effect such changes. This has the potential for a client to default on such settlements. In addition, Castro has been damaged by JGW's continued communications with its clients, as it results in confusion and delay in the transition to a new service provider. Accordingly, Castro has a likelihood of success on the merits of its breach of contract claim.

## C.     Irreparable Injury Will Result In The Absence Of An Injunction.

The facts further demonstrate that Castro will continue to suffer irreparable injury and threat of irreparable injury in the absence of the requested relief. Ohio law defines irreparable injury as "one for the redress of which, after its occurrence, there could be no plaint, adequate and complete remedy at law," and for which restitution would be impossible, difficult, or incomplete. *See Cleveland v. Cleveland Elec. Illuminating Co.*, 115 Ohio App.3d 1, 12 (8th Dist. 1996); *Landskroner v. Landskroner*, 154 Ohio App. 3d 471, 2003-Ohio-4945, at ¶ 37 ("In general, a party is

irreparably harmed and without an adequate remedy at law where an alleged injury is incapable of being measured in pecuniary terms."); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir.1992) ("an injury is not fully compensable by money damages if the nature of plaintiff's loss would make damages difficult to calculate"); *Eller Media Co. v. City of Cleveland*, 161 F. Supp. 2d 796, 807 (N.D. Ohio 2001) ("[I]n cases in which there is undoubtedly economic harm, but the amount of harm is difficult or impossible to determine, the court may issue the injunction because the injury is 'irreparable' in the sense that it can never be accurately quantified.") (*citing Basicomputer Corp.*), *aff'd sub nom. Eller Media Co. v. City of Cleveland*, 326 F.3d 720 (6th Cir. 2003). To determine whether a party will suffer irreparable harm in the absence of an injunction, "the moving party need not demonstrate actual harm," but rather, "a <u>threat</u> of harm." *See Convergys Corp. v. Tackman*, 169 Ohio App. 3d 665, 2006-Ohio-6616, at ¶ 9 (1st Dist.) (emphasis added, internal citation omitted). Here, both the ongoing and threatened injuries to Castro and its clients cannot be stopped or remedied without the requested relief.

If Castro is not provided with immediate access to all its Confidential Information and that of the Applicable Clients, as required under the Agreement, Castro (and its clients) will suffer irreparable harm. As noted above, access to the information contained within Debt Manager is critical to the monitoring and, as necessary, adjustment to clients' settlement payment plans. Without such monitoring and adjustments, clients may potentially default on settlements with their creditors, thus subjecting them to lawsuits, garnishments, and/or other adverse consequences.

And such adverse consequences open Castro up to the possibility of dissatisfied clients, bar issues, and other actions. Similarly, if JGW is not barred from communicating with Castro's clients, Castro will suffer further harm in that its clients will be confused, and the transition to the new service provider, NF Financial, will be delayed. Such damage cannot be accurately calculated or fully compensated by money damages.

**D.    There Is No Injury To Third Parties That Would Preclude The Injunctive Relief Requested By Castro, And The Public Interest Will Be Served.**

Granting injunctive relief would not result in any injury to third parties. In fact, just the opposite. Requiring JGW to turn over Castro's confidential information and information relating to the Applicable Clients is for the ***benefit*** of Castro's clients, innocent third parties. Indeed, as discussed above, without access to the information being held hostage by JGW, Castro cannot fully monitor and administer its clients' settlement plans. And if JGW is not barred from communicating with Castro's clients, clients are at risk of receiving conflicting (or even incorrect) information and confusion over the identity of their point of contact for Castro client service. Injunctive relief is necessary to preserve the relationships between Castro and its clients.

## IV.    <u>Conclusion</u>

For the reasons set forth herein, Plaintiff Castro Law, LLC requests that this Court enter a Temporary Restraining Order and Preliminary Injunction: (1) requiring JGW Debt Settlement, LLC to immediately return all Castro Confidential

Information; (2) requiring JGW Debt Settlement, LLC to immediately provide Castro and NF Financial with access to the Applicable Client data that is maintained in Debt Manager and/or any other electronic platform to which JGW Debt Settlement, LLC has exclusive access; (3) barring JGW Debt Settlement, LLC and its agents, employees, contractors, vendors, members, managers, and any other person or entity acting on behalf of or at the direction of JGW Debt Settlement, LLC from communicating with Applicable Clients; and (4) ordering any other such injunctive relief as this Court deems just and necessary.

Dated: May 2, 2024

Respectfully submitted,

_/s/ E. Mark Young_____
E. Mark Young (0074275)
Roetzel & Andress, LPA
1375 E. 9th Street
One Cleveland Center, 10th Floor
Cleveland, Ohio 44114
Phone:     (216) 623-0150
Facsimile: (216) 623-0134
Email: emyoung@ralaw.com

And

John J. Rutter (0079186)
Roetzel & Andress, LPA
222 S. Main Street
Akron, OH  44308
Ph:  (330) 849-6713
Fax:  (330) 376-4577
Email: jrutter@ralaw.com

And

Emily Shupe (PHV No. 15009-2023)
Rathje Woodward LLC
300 East Roosevelt Road
Suite 300
Wheaton, Illinois 60187
Ph:  (630) 510-4930
Email:  eshupe@rathjelaw.com

*Attorneys for Plaintiff Castro Law, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2024, a copy of the foregoing was served by email transmission to the following:

Richard W. Epstein, Esq.
200 East Broward Boulevard, Suite 1800
Fort Lauderdale, Florida 33301
Email: richard.epstein@gmlaw.com
*Counsel for JGW Debt Settlement, LLC*

_/s/ E. Mark Young_____
E. Mark Young (0074275)

## THE COURT OF COMMON PLEAS, CIVIL DIVISION
## CUYAHOGA COUNTY, OHIO

Clerk of Courts | The Justice Center | 1200 Ontario Street 1st Floor, Cleveland, Ohio 44113

<u>CASTRO LAW, LLC</u>
**Plaintiff**

**CASE NO.** CV24996863

V.

**JUDGE** RICHARD A BELL

<u>JGW DEBT SETTLEMENT, LLC</u>
**Defendant**

# SUMMONS SUMC CM

**Notice ID:** 53718919

| From: | CASTRO LAW, LLC | P1 |
| | 2371 HUFF PLACE | |
| | HIGHLAND MI 48356 | |

| Atty.: | JOHN J RUTTER |
| | 222 SOUTH MAIN STREET |
| | SUITE 400 |
| | AKRON, OH 44308-0000 |

| To: | JGW DEBT SETTLEMENT, LLC | D1 |
| | 1200 MORRIS DRIVE | |
| | CHESTERBROOK PA 19087 | |

**NOTICE TO THE DEFENDANT:**

The Plaintiff has filed a lawsuit against you in this Court. You are named as a defendant. A copy of the **Complaint** is attached.

If you wish to respond to the Complaint, you must deliver a written **Answer** to the Plaintiff's attorney (or the Plaintiff if not represented by an attorney) at the above address *within 28 days* after receiving this Summons (not counting the day you received it). A letter or a phone call will not protect you. Civil Rule 5 explains the ways that you may deliver the **Answer** (http://www.supremecourt.ohio.gov/LegalResources/Rules/civil/CivilProcedure.pdf)

You must also file a copy of your **Answer** with this Court within 3 days *after* you serve it on the Plaintiff. You can file your **Answer** with the Clerk of Courts by one of the following methods: 1) In-person or by mail at the above address or 2) electronically through the online e-Filing system. For more information on using the e-Filing system, visit http://coc.cuyahogacounty.us/en-US/efiling.aspx.

If you fail to serve *and* file your **Answer**, you will lose valuable rights. The Court will decide the case in favor of the Plaintiff and grant the relief requested in the **Complaint** by entering a default judgment against you.

You may wish to hire an attorney to represent you. Because this is a civil lawsuit, the Court cannot appoint an attorney for you. If you need help finding a lawyer, contact a local bar association and request assistance.



**Nailah K. Byrd**
**Clerk of Court of Common Pleas**
**216-443-7950**

**Date Sent:** <u>05/02/2024</u>

**By**_____
**Deputy**

CMSN130



181357038

# IN THE COURT OF COMMON PLEAS
# CUYAHOGA COUNTY, OHIO

CASTRO LAW, LLC
    Plaintiff

Case No: CV-24-996863

Judge: RICHARD A BELL

JGW DEBT SETTLEMENT, LLC
    Defendant

## **JOURNAL ENTRY**

HEARING SET FOR 05/08/2024 AT 01:00 PM.  HEARING ON PLAINTIFF'S MOTION FOR TRO.  COURTROOM 21-D.

_____
    Judge Signature               05/03/2024

05/03/2024

Motion No. <u>5167820</u>



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**MOTION FOR...**
**May 6, 2024 13:52**

By: JOHN J. RUTTER 0079186

Confirmation Nbr. 3159446

CASTRO LAW, LLC

vs.

JGW DEBT SETTLEMENT, LLC

CV 24 996863

**Judge:** RICHARD A. BELL

**Pages Filed:** 6

IN THE COURT OF COMMON PLEAS - CUYAHOGA COUNTY

CASTRO LAW, LLC,                          :
                                          :
                                          :
        v.                                :
                                          :          Case No. 24-CV-996863
                                          :
JGW DEBT SETTLEMENT, LLC                  :
                                          :
                                          :
                                          :.

## MOTION FOR PERMISSION TO APPEAR PRO HAC VICE

Pursuant to Gov.Bar R. XII(2)(A)(7), John Rutter , attorney for Plaintiff ,
hereby moves the Cuyahoga Co. Ct. of Common Pleas to grant Emily A. Shupe permission to appear pro
hac vice and participate as counsel or co-counsel in this case for Plaintiff, Castro Law, LLC .

Movant represents that the following is a list of the jurisdictions in which Emily A. Shupe has ever
been licensed to practice law, including dates of admission to practice, resignation, or retirement, and any
attorney registration numbers:
See attached addendum.

Movant represents that Ms. Shupe has not been granted permission to appear pro hac vice in more than
three proceedings before Ohio tribunals in the current calendar year pursuant to Gov.Bar R. XII(2)(A)(6).
John Rutter , an active Ohio attorney in good standing, has agreed to
associate with Movant on this case.

The affidavit required by Gov.Bar R. XII(2)(A)(7)(c), a copy of Movant's certificate of pro hac vice
registration furnished by the Supreme Court of Ohio Office of Bar Admissions, and a certificate indicating
service of this Motion on all known parties and attorneys of record are attached. Movant understands that, if this
Motion is granted, Movant must file a Notice of Permission to Appear Pro Hac Vice and a copy of the

Order granting permission with the Supreme Court of Ohio Office of Bar Admissions within thirty days of the

Order.

 

    Emily A. Shupe
(Name of Movant/PHV Attorney)

PHV - 15009
(PHV Registration Number)

Rathje Woodward LLC
(Law Firm or Employer, if applicable)

300 E. Roosevelt Road, Suite 220
(Business Address)

Wheaton, IL 60187
(City, State or Country, ZIP Code)

(630) 668-8500
(Business Telephone)

(630) 668-9218
(Business Fax)

eshupe@rathjelaw.com
(Business E-Mail)

1840 N. Albany

Chicago, IL 60647

(Residential Address)

## **PROOF OF SERVICE**

The undersigned hereby certifies that a true and accurate copy of the foregoing has been served via regular U.S. Mail, postage prepaid, pursuant to Ohio Civ. R. 5(B)(2)(c) or via electronic means to the e-mail address(es) identified below pursuant to Civ. R. 5(B)(2)(f), on this 6th day of May, 2024:

JGW Debt Settlement LLC
1200 Morris Drive
Chesterbrook, PA 19087

Emily A. Shupe, Esq.
Rathje Woodward LLC
300 E. Roosevelt Avenue, Suite 220
Wheaton, IL 60187
E-mail: eshupe@rathjelaw.com

/s/ John J. Rutter
John J. Rutter

IN THE MATTER OF THE MOTION OF

Emily A. Shupe

CASE NO. _24-CV-996863_____

FOR PERMISSION TO APPEAR PRO HAC VICE

Emily A. Shupe

**AFFIDAVIT OF
OUT-OF-STATE ATTORNEY**
Gov. Bar R. XII, Section 2(A)(7)

_____ being first duly cautioned, swears or affirms as

follows:

a.  I have never been disbarred from the practice of law.

b.  I have been admitted to the practice of law in the following jurisdictions (attach additional
jurisdictions if necessary):

Illinois (11/09/2006) IL#6288926          See Addendum.

c. Choose one:
☑ I am not currently suspended from the practice of law in any jurisdiction where I have
been admitted to practice.
☐ I am currently suspended from the practice of law in the following jurisdictions:

d. Choose one:
☑ I have not resigned from the practice of law with discipline pending in any jurisdiction
where I have been admitted to practice.
☐ I have resigned from the practice of law with discipline pending in the following
jurisdiction(s):

OFFICIAL SEAL
LINDSEY BULLIS
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:11/10/24

SIGNATURE OF APPLICANT

Sworn to or affirmed before me and subscribed in my presence the _3rd_ day of _MAY_____

20_24_ , in the state of _Illinois_____ and county of _DuPage._____

SIGNATURE OF NOTARY PUBLIC*

*Affix stamp & seal (required in Ohio).

## ATTORNEY EMILY A. SHUPE'S ADMISSION ADDENDUM

| Court | Year of Admission | Bar No. (if applicable) |
|---|---|---|
| State of Illinois | 2006 | 6288926 |
| USDC, Northern District of Illinois | 2007 | N/A |
| USDC, Northern District of Illinois Trial Bar Member | 2009 | N/A |
| USDC, Central District of Illinois | 2012 | N/A |
| USDC, Eastern District of Michigan | 2014 | N/A |
| USDC, Colorado | 2012 | N/A |
| USCA, Seventh Circuit | 2009 | N/A |
| USCA, Second Circuit | 2024 | N/A |

# THE SUPREME COURT *of* OHIO

Office of Bar Admissions

IN THE MATTER OF THE APPLICATION OF

**Emily Shupe**

_____

**FOR PRO HAC VICE REGISTRATION**

per Gov. Bar R. XII, Section 2(A)(3)

Certificate of

PRO HAC VICE
REGISTRATION

2024

Registration Number:
PHV- 15009-2024

Emily Shupe
_____, having met the requirements of, and found to be in

full compliance with, Section 2(A)(3) of Rule XII of the Rules for the Government of the Bar of

Ohio, is hereby issued this certificate of pro hac vice registration in the state of Ohio.

To receive permission to appear pro hac vice in an Ohio proceeding, a motion requesting such

permission must be filed with the tribunal in accordance with Section 2(A)(6) of Rule XII of the

Rules for the Government of the Bar of Ohio.

Issued by the Office of Bar Admissions.

**Expires December 31, 2024**



181435109

# IN THE COURT OF COMMON PLEAS
# CUYAHOGA COUNTY, OHIO

CASTRO LAW, LLC
    Plaintiff

Case No: CV-24-996863

Judge: RICHARD A BELL

JGW DEBT SETTLEMENT, LLC
    Defendant

## JOURNAL ENTRY

MOTION FOR PERMISSION TO APPEAR PRO HAC VICE OF EMILY A. SHUPE, FILED 05/06/2024, IS GRANTED.  EMILY A. SHUPE IS PERMITTED TO APPEAR BEFORE THIS COURT AND PARTICIPATE PRO HAC VICE FOR THE PLAINTIFF CASTRO LAW, LLC.

_Richard A. Bell_
_____
Judge Signature          05/07/2024

05/06/2024